805 So.2d 1157 (2002)
Donna HILLMAN
v.
COMM-CARE, INC., Community Care Center of Leesville.
No. 2001-C-1140.
Supreme Court of Louisiana.
January 15, 2002.
Rehearing Denied February 22, 2002.
*1158 James A. Holmes, Esq., Christovich & Kearney, for Applicant.
George A. Flournoy, Esq., Maria A. Losavio, Esq., Doggett & Losavio, for Respondent.
*1159 ROBERT L. LOBRANO, Justice Pro Tempore.[*]
The narrow issue in this workers' compensation case is whether plaintiff, a beautician, was an employee of defendant, a nursing home, on August 7, 1996, when she injured her back lifting a resident in defendant's on-site beauty salon. The workers' compensation judge concluded that there was an employment relationship and awarded both temporary total disability benefits and attorney's fees. The court of appeal affirmed. Concluding that there was no employment relationship, we reverse.

Factual and Procedural Background
As an accommodation to its residents, defendant, Comm-Care, Inc., Community Care Center of Leesville, advertised and provided on-site beauty salon services. Plaintiff, Donna Hillman, provided those services once or twice a week while contemporaneously working at a local beauty parlor. Hillman heard about the nursing home position from Gaynell Ford, the home's activity coordinator; Hillman and Ford both attended the same church. When Hillman came in to apply for the position, Ford introduced her to the home's administrator, William Lang, Jr.
After an in-the-hall interview during which Hillman established her status as a licensed beautician and Lang discussed with her the ground rules for using the home's on-site beauty salon, Lang agreed to allow Hillman to provide beauty services at the home. As part of the ground rules, Hillman was instructed to follow two lists. The first was a price list that was posted on the salon mirror; she was told that she had to charge these predetermined prices for the various hair care servicescut, shampoo, perm, set, and colorand that she could charge no more and no less and that she could accept no tips. The second list, which was also posted on the salon wall, was an enumeration of thirteen beauty and barber shop rules regarding hygiene that were to be followed by anyone providing services to the residents.
During the interview, they agreed upon Wednesday as the day on which Hillman would work. Eventually this was extended to include a second day, Monday. Also, Hillman testified that she was on call for emergencies and special occasions such as weddings and funerals. Although Hillman testified that she was told the beauty salon would be limited solely to her use, Lang testified and attested in his affidavit that "[a]ny resident could have a family member or their own beautician/barber come and use the facility." Lang further testified that the residents were at liberty, if physically able, to go off site to have their hair cut and that he personally brought a male resident to the barber. Still further, Lang attested that "[n]ursing home staff washed each resident's hair every time the resident was bathed for sanitary purposes." And, it was also established at trial that the salon facility was used for other purposes, such as by a visiting podiatrist and dentist.
Hillman was not given a key to the salon; instead, she testified during the interview Lang told her she "could come in at eight o'clock and they would let [her] in, and they would lock up after [she] got through." When she arrived at 8:00 a.m., she was provided a "Beauty Shop Sign in Sheet," which listed the residents who signed up that day for her services. She testified that she was expected to continue working until she finished everyone on the *1160 The residents who were competent personally told her how they wanted their hair done; the nursing home relayed to her the family members' instructions on how to do the hair of the residents who were not competent. While she performed the bulk of her services in the beauty salon itself, she also was required to service some residents in their rooms. Sometimes, Hillman testified, her sister would come with her to help with washing residents' hair and with getting residents from their rooms.
Unlike Comm-Care's employees, Hillman was not required to wear a uniform. Nor was she required to complete any employment applications or forms. Nor did Comm-Care keep any employment records on her. Nor was she ever on Comm-Care's payroll. Instead, she was paid either directly by the residents in cash or indirectly from the residents' personal patient fund account. As to the latter charges, Hillman completed the sign in sheet to get paid indirectly. On the sheet, she listed next to the resident's name the service provided that day, the predetermined price for that service, and the resident's choice of payment modecash or charged to their patient trust account. At the end of the day, Hillman delivered that sheet to the home's administrative assistant, Sheila Stomps. Stomps then debited the residents' patient fund account and issued Hillman a check from that account. The latter account, which the nursing home was legally required to maintain for each resident, contained funds belonging solely to the residents. Comm-Care never withheld any type of taxes from the payments it made to Hillman on behalf of its residents.
As to supplies and equipment, Comm-Care provided Hillman with the major equipment needed for a beauty salon, including two hydraulic chairs, two dryers, and a shampoo bowl; Comm-Care also provided towels, trash bags, certain medicated shampoos, and germicide. Hillman supplied her own hair treatment supplies, including hair rollers, regular shampoos, combs, perm solutions, and scissors. Comm-Care never reimbursed Hillman for the supplies she furnished.
This arrangement continued from February 1995 until August 7, 1996, the date Hillman injured her back lifting a resident from her wheelchair to the shampoo chair in the beauty salon. As a result, Hillman was required to undergo two surgeries and was unable to work. On July 14, 1997, however, Hillman returned to work in another field for another employer. On August 4, 1997, Hillman filed the instant workers' compensation claim against Comm-Care. Although Comm-Care stipulated to Hillman's back injury, it disputed her employment status.
Citing as controlling Boswell v. Kurthwood Manor Nursing Home, 94-703 (La. App. 3d Cir.12/7/94), 647 So.2d 630, writ denied, 95-0050 (La.3/17/95), 651 So.2d 267, Comm-Care filed a motion for summary judgment. Boswell, supra, involved an identical factual scenario that took place at the identical nursing home facility, albeit under prior management. Mrs. Boswell injured her back while moving a patient from the shampoo chair to the styling chair in the same on-site beauty salon where Hillman injured her back. The Third Circuit in Boswell reversed the workers' compensation hearing officer's finding that Mrs. Boswell was a nursing home employee.
Agreeing with Comm-Care that Boswell was controlling, the workers' compensation judge granted summary judgment, finding that Hillman was not a Comm-Care employee. Reversing, the court of appeal acknowledged that Boswell was factually similar, yet distinguished Boswell factually *1161 and held that the workers' compensation judge erred in legally determining that an employer-employee relationship was lacking. 98-1341 (La.App.3d Cir.5/19/99), 732 So.2d 841 ("Hillman I"). Hillman I was a split decision by the Third Circuit; the two dissenting judges opined that as a matter of law, even assuming Hillman's allegations regarding Comm-Care's control over her fees, hours, and the facility, there was no reasonable basis on which it could be concluded an employer-employee relationship existed. Thus, in the dissenters' opinion, this case is analogous to Boswell.
On remand, following a trial at which evidence was introduced regarding Hillman's employment status, the workers' compensation judge found that Hillman was an employee. In so finding, the court relied primarily on the nursing home's power of control and dismissal and in its oral reasons stated that "the nursing home set the hours, controlled eighty percent or more of the funds received by Ms. Hillman through the patients' fund, and could dismiss her at will as they did Ms. Robinson, or Ms. Robertson [her predecessor]." Finding no manifest error, stressing Comm-Care's failure to present any new substantial evidence at trial, and noting the distinguishing factors cited in Hillman I between this case and Boswell "are even more pronounced in light of the additional evidence produced by Ms. Hillman at the trial on the merits," a divided appellate court affirmed. 00-1048 (La.App. 3d Cir.3/21/01), 782 So.2d 1147 ("Hillman II"). Once again, the same two judges voiced a vigorous dissent, opining that Hillman was not an employee of Comm-Care. On Comm-Care's application, we granted certiorari. 01-1140 (La.6/15/01), 793 So.2d 206.

Analysis

Presumption of Employment
Inherently, workers' compensation is a remedy between an employer and an employee; it follows then that absent an employer-employee relationship generally there can be no compensation recovery. Johnson v. Alexander, 419 So.2d 451 (La.1982).[1] The Louisiana Workers' Compensation Act is silent on what constitutes an employer-employee relationship; the sole provision on this subject is the statutory presumption of employment status. 1 Denis Paul Juge, Louisiana Workers' Compensation § 7:1 (2001). That presumption provides that "[a] person rendering service for another in any trades, businesses or occupations covered by this Chapter is presumed to be an employee under this Chapter." La. R.S. 23:1044. An alleged employer can rebut this presumption by either (i) establishing that the services were not "pursuant to any trade, business, or occupation (e.g., construction of one's private residence);" or (ii) establishing that "the individual was performing services but was doing so as an independent contractor." Juge, supra at § 7:6.
In determining whether the presumption is rebutted because the services were not "pursuant to any trade, business, or occupation" of the alleged employer, the initial inquiry is whether the work is a "business pursuit" of the alleged employer. Id. Explaining the cited example of an individual constructing his private residence, a commentator notes that "[t]he courts have universally held that a homeowner who hires workers to build or repair the home or other nonbusiness property *1162 is not engaged in a business pursuit when contracting with workers and is thus not responsible for workers' compensation benefits." Id.
Implicitly, the Third Circuit in its two prior decisions addressing similar attempts to bring this type of unusual arrangement under the Workers' Compensation Act acknowledged that this arrangement is not a "business pursuit" of the nursing home. Boswell, supra; Jordan v. Central Management Co., 99-748 (La.App. 3d Cir.10/13/99), 745 So.2d 116, writ denied, 99-3231 (La.1/14/00), 753 So.2d 220.[2]
In Boswell, Justice (then Judge) Knoll found the nursing home's provision of these beautician services to be an accommodation to its elder residents. In so doing, Justice Knoll cited as analogous a line of jurisprudence rejecting similar attempts to characterize patient sitters as hospital employees. 94-703 at p. 2, 647 So.2d at 631 (citing Prince v. Baton Rouge General Hospital, 449 So.2d 90 (La.App. 1st Cir.), writ denied, 450 So.2d 966 (La. 1984), and Vaughn v. Baton Rouge General Hospital, 421 So.2d 288 (La.App. 1st Cir.1982)). In those cases, the courts reasoned that while the hospital made the initial contact to obtain the sitter, this was done solely as an "accommodation" for its patients. Vaughn, 421 So.2d at 290.
Attempting to distinguish the beautician services Comm-Care offered from a mere accommodation, Hillman emphasizes that Comm-Care advertised it offered such in-house beautician services and that its residents became upset during the interval when such services were temporarily discontinued. This argument overlooks that Comm-Care was not in the "trade, business, or occupation" of providing beautician services. As the Boswell court noted, "[t]he beautician services for which Mrs. Boswell was made available were over and above [the] minimum, at the option of the resident, and paid for by the resident." 94-703 at p. 5, 647 So.2d at 633. Similarly, the Jordan court characterized such beautician services as "a luxury, an extra, provided to accommodate nursing home residents." 99-748 at p. 12, 745 So.2d at 122. Indeed, the beautician in Jordan testified that "her prices were significantly lower than what they would have been in a salon outside of the nursing home." 99-748 at p. 6, 745 So.2d at 119.
We conclude that the in-house beautician services that Comm-Care provided through Hillman were an accommodation to its residents, not a business pursuit. Thus, the statutory presumption is thus rebutted.

Employee status
In characterizing Hillman as Comm-Care's employee, the lower courts based their analysis on a jurisprudentially crafted test for determining whether an employer-employee relationship exists that can be traced back to Alexander v. J.E. Hixson & Sons Funeral Home, 44 So.2d 487 (La.App. 1st Cir.1950). In Alexander, the court turned for guidance to the general statement of law then set forth in 35 Am.Jur. § 3; to wit:
The essence of the [employer-employee] relationship is the right to control. The four primary evidentiary factors considered in deciding the above are
1. Selection and engagement;
2. Payment of wages;
3. Power of [d]ismissal;
4. Power of control. *1163 44 So.2d at 488. The appellate courts in subsequent cases, including the sitter cases noted above, have utilized this test. In so doing, the courts have reasoned that none of the factors is controlling, that the totality of the circumstances must be considered, and that the burden of proof is on the party seeking to establish an employer-employee relationship.
In factual scenarios strikingly similar to that presented in this case, the Third Circuit in Boswell and Jordan applied this four-factor test to characterize the beautician as an independent contractor, not an employee. In reaching a contrary conclusion in the instant case, the Third Circuit enumerated four facts that it found distinguished this case from Boswell; to wit: (i) Hillman was required to interview for the position; (ii) Comm-Care controlled both her work days and hours; (iii) Comm-Care controlled its beauty salon facility; and (iv) Comm-Care, although it did not directly pay her, controlled the amount she could charge the patients to whom she provided the services.[3]
Hillman argues that the lower courts' finding of employee status was not manifestly erroneous and thus should be upheld. Comm-Care counters that these four factual distinctions relied on by the Third Circuit are insufficient to establish the type of control required for employee status.[4] Rather than repeat an analysis of the four-factor test found in Boswell and Jordan, we resolve the narrow issue before us by focusing on the four factual differences the Third Circuit enumerated as distinguishing this case from Boswell and as dictating that Hillman be classified as an employee. After review of those distinguishing factors, we conclude that none makes such a difference as to create an employer-employee relationship between Comm-Care and Hillman. We find Hillman's status to be no different than Mrs. Boswell'sthat of an independent contractor.

(i) The interview
The gist of Hillman's interview with Lang was a discussion of the ground rules that she was required to follow in using the nursing home's on-site beauty salon (including the two posted lists) and of her work days. As the dissenting judge in Hillman II points out, this interview was identical to the discussion the nursing home administrator in Jordan had with the beautician. Given the interview was simply a discussion of the use of the facility, it did not alter the fact that the power of selection and engagement of Hillman's services-as in both Boswell and Jordanremained with the individual residents for whom she performed her services.[5]

*1164 (ii) Control over work days and hours

In distinguishing this case from Boswell, the lower courts found merit to Hillman's contention that Comm-Care controlled her hours in that she was expected to work each Monday and Wednesday from 8:00 a.m. until she finished all the residents who signed up for her services. Comm-Care counters that its sole control over the hours Hillman worked was that it opened the salon door at 8:00 a.m. Continuing, Comm-Care contends, Hillman's work hours were dependent upon the number of residents who opted to sign up for her services.
We conclude that Hillman had ultimate control over her work hours. Our conclusion is based not only on the fact that Comm-Care's sole connection with her work hours was opening the door at 8:00 a.m., but also, as mentioned earlier, that Hillman testified that sometimes her sister came to help her with washing the residents' hair and getting the residents from their rooms. That Hillman was allowed to bring help is significant factually and legally. Factually, logic dictates that two hands are faster than one at getting the job done. Legally, the ability of an individual to hire helpers and assistants is characteristic of an independent contractor. 13 H. Alston Johnson III, Louisiana Civil Law Treatise: Workers' Compensation Law and Practice: Malone & Johnson § 79 (3rd ed.1994).

(iii) Control over its beauty salon facility
As to Comm-Care's control over its facility, we find instructive the sitter cases, mentioned earlier, in which the courts recognized that the hospital's exercise of minimal control over the sitter so as to maintain the integrity and uniformity of its facility was insufficient to transform the arrangement into an employer-employee relationship. See Prince, supra; Vaughn, supra. Similarly, Comm-Care's exercise of minimal control over its facility by not giving Hillman a key and by requiring her to comply with a list of hygiene rules is insufficient to transform this arrangement into an employer-employee relationship. Explaining why the workers' compensation judge's reliance on Comm-Care's purported control over its facility was misplaced, the dissenters in Hillman II stated:
[T]he evidence introduced deals primarily with the nursing home's power to dictate who used its facilities and how they were allowed to use them. There was no evidence that the limitations placed on Hillman were any different than the limitations placed on anyone using the facilities. Comm-Care clearly had the right to bar any party from using its facilities at any time. Accordingly, these elements of control do not create an employment relationship. There is no evidence that Comm-Care dictated how Hillman was to complete her tasks with the exception of general rules required to insure proper sanitation.
00-1148 at p. 2, 782 So.2d at 1154 (Decuir, J., dissenting).
The element of control that distinguishes an employee from an independent contractor focuses on whether the purported employer had the right to control the method and means by which the individual performed the work tasks. Hickman v. Southern Pacific Transport Co., 262 La. *1165 102, 262 So.2d 385 (1972). As the dissenters correctly point out, that element of control in this case was lacking; the record reflects that Hillman was not subject to any greater degree of control over her beautician tasks at Comm-Care than she was at the local beauty parlor at which she simultaneously worked. Indeed, Hillman's simultaneous employment elsewhere further supports the independent nature of her beautician services.

(iv) Control over prices
The final factor the court of appeal enumerated as distinguishing this case from Boswell was that Comm-Care required Hillman to charge a predetermined rate for her services. Simply stated, this distinguishing factor was that, unlike Mrs. Boswell, Hillman did not get to set her own prices.
While much emphasis is placed on this price list, the record reflects that no one knew who composed and posted the price list. In Comm-Care's corporate deposition, its representative, William M. Bauder, testified that he did not know where the list was derived from and that "as far as me telling this particular beautician this is what a haircut costs or this and that, we haven't had any negotiations of anything in that realm. I believe that list was just something from a previous beautician." Likewise, Lang testified at trial that he did not know where the price list originated. It follows then that the price list apparently had become an accepted fixture of the in-house beauty salon.
Furthermore, no one testified at trial that Hillman ever expressed a desire to alter the price list. The sole relevance of the price list is that it removed from Hillman the onus of creating her own price list. We also note that these predetermined prices were only one part of the equation that determined how much Hillman was paid. The other part, which Comm-Care did not control, was how many residents opted to sign up for Hillman's services. Whatever control Comm-Care exercised by requiring that Hillman abide by the price list, we conclude that, when considered in context, that control over the prices was insufficient to transform this arrangement into an employer-employee relationship.

Conclusion
Based on the above analysis and applying the manifest error standard of review, we hold that the record in this case, even when viewed most favorably to the prevailing party below, simply does not furnish a reasonable factual basis for the workers' compensation judge's finding of an employment relationship. Williams v. Keystone General Contractors, Inc., 488 So.2d 999 (La.1986). Accordingly, we conclude that the lower courts erred in finding an employer-employee relationship between Comm-Care and Hillman.

Decree
For the foregoing reasons, the judgments of the lower courts are reversed, and this case is dismissed.
REVERSED.
JOHNSON, J., dissents and assigns reasons.
JOHNSON, J., Dissenting.
I disagree with the majority's conclusion that Ms. Hillman's relationship with the nursing home was that of an independent contractor. A reading of the trial transcript demonstrates that the duties performed by Ms. Hillman at the nursing home placed her in the category of an employee, thereby allowing her to collect workers' compensation benefits for her injuries sustained in the course and scope of her employment.
Ms. Hillman was hired to provide services to patients in defendant's nursing *1166 home. Although hired as a licensed beautician, Ms. Hillman also worked along side the nurse's aides and shared some of their duties in providing these services. In fact, she was in the process of lifting a patient from a wheelchair when she was injured. Ms. Hillman was under the direct control of the nursing home since she was not allowed to set her own fees or work hours. Instead, she was provided with a list each morning on the salon door listing the patients who needed services and what was to be done for them. The nursing home also provided a price list which Ms. Hillman testified she was mandated to follow. Ms. Hillman further testified that she was required to report to the nursing home at eight o'clock on Mondays and Wednesdays and would not leave the facility until all patients on the list were serviced.
In addition, Ms. Hillman was required to follow certain rules established by the nursing home. She was even required to administer various medications to the patients for scalp disease or lesions as needed. It is apparent that Ms. Hillman was not merely providing a luxury service to the female patients who chose to use her services. She was also required to provide service to both male and female patients who were not ambulatory. For instance, under the order and direction of the nurses, Ms. Hillman would go to the rooms of Alzheimer's patients, skilled care unit patients and paraplegics, both male and female, who needed to be shaved and groomed. Clearly, these patients did not choose Ms. Hillman or contract with her for her services. I would affirm the lower courts which determined that Ms. Hillman had employee status and she should be allowed to collect under the workers' compensation statute.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Justice Pro Tempore, participating in the decision.
[1] An exception is statutorily carved out for an independent contractor performing manual labor. Although Hillman argues in the alternative that if she is an independent contractor this exception applies, we disagree. Based on the nature of the beautician services Hillman performed, she clearly was not performing "manual labor."
[2] While this reasoning from Boswell and Jordan was directed to the issue of whether the beautician was a statutory employee, the same logic explains why the presumption of employment does not apply to such in-house, non-business pursuits.
[3] The Jordan case was decided by the Third Circuit during the interval between Hillman I and Hillman II. In Jordan, the court noted the four factual distinctions between Boswell and the instant case and stressed that Hillman I was a summary judgment case.
[4] Comm-Care further contends that the court of appeal erred in finding it did not put on any new substantial evidence at trial. The record supports this contention.
[5] Nor, contrary to Hillman's contention, is this case distinguishable in regards to the power of dismissal. In Boswell, the court reasoned that "nothing in the record substantiates Mrs. Boswell's `understanding' that [if the nursing home was dissatisfied with her services they could tell her to leave at any time.]" 94-703 at p. 4, 647 So.2d at 632. Hillman contends that the record substantiates such an "understanding" in this case given the testimony at trial that Lang terminated the beautician whom she replaced who had only been there for a short term. The record, however, reflects that Gaynell Ford, the home's activity coordinator, was asked at trial if she knew what happened to Hillman's immediate predecessor; Ford responded: "My understanding was she was dismissed, the elderly people didn't like the way" This testimony clearly undercuts Hillman's contention; as in Boswell and Jordan, Comm-Care had the right to exclude Hillman from its physical premises, but the residents were free to seek out Hillman's services elsewhere without seeking Comm-Care's consent. The power of dismissal thus remained with the individual residents for whom Hillman worked.