# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-215


JACKIE MOUTON

VERSUS

WE CARE HOMES, INC.


************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. 2002-6260,
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.


**REVERSED AND REMANDED.**

Amos H. Davis
Attorney at Law
7932 Wrenwood Boulevard, Suite B
Baton Rouge, Louisiana 70809
(225) 248-1400
Counsel for Defendant/Appellee:
    We Care Homes, Inc.

Walter K. Jamison, III
Marjorie B. Breaux
Daigle, Scofield, Crawford & Jamison, LLC
303 W. Vermilion, Suite 210
Lafayette, Louisiana 70501
(337) 234-7000
Counsel for Plaintiff/Appellant:
    Jackie Mouton

SULLIVAN, Judge.

Jackie Mouton, a registered nurse (RN), was injured while performing nursing services for We Care Homes, Inc. (We Care), a provider of community group homes for mentally disabled adult males. The trial court dismissed Ms. Mouton's tort suit on summary judgment after concluding that her exclusive remedy against We Care was in workers' compensation. For the following reasons, we reverse and remand.

**Discussion of the Record**

On December 4, 2002, Ms. Mouton filed suit, alleging that she was injured on September 9, 2002, when she was attacked by a patient residing in one of the two group homes operated by We Care. At the time of the attack, Ms. Mouton was performing services as a "consulting nurse" pursuant to a contract that she executed with We Care on May 29, 1995. On May 27, 2003, We Care filed a motion for summary judgment seeking dismissal of the suit on two grounds: (1) that Ms. Mouton was an employee injured in the course and scope of her employment; therefore, her exclusive remedy was in workers' compensation; and (2) that We Care was not negligent, as it complied with all state regulations regarding the admission of the resident at issue, or, in the alternative, that Ms. Mouton was solely at fault because she failed to inform We Care that this resident required more extensive care than that offered by the group home. Ms. Mouton opposed the motion, arguing that genuine issues of material fact existed as to whether or not she was an employee of We Care and whether or not We Care was negligent failing to remove a resident with a history of violent behavior from one of its homes.

The contract between Ms. Mouton and We Care listed several duties of the "consultant," including (1) preparing, reviewing, and supervising the implementation of a health care plan for each resident; (2) caring for minor illnesses, injuries, and

emergencies; (3) providing for the consultation and overall management of health services for each resident; (4) reviewing medications of each resident at least monthly; (5) assuring that routine, special, and emergency needs of each resident are met; (6) training other staff members; and (7) providing other services as needed. The contract provided for a monthly salary of $450.00 ($225.00 per home) and stated that either party could withdraw from it upon thirty days written notice. It is undisputed that We Care did not withhold any state or federal taxes from Ms. Mouton's salary.

In her deposition, Ms. Mouton testified that she initially went to each of the two group homes about once a month to do paperwork, but that she was on call twenty-four hours a day. She explained that her visits to each home lasted about two hours, during which time she would document each resident's medical history and would check their vital signs. In between these visits, she was expected to take all calls regarding problems with the residents, including medication changes, accidents, and seizures. Ms. Mouton testified that she did not have any set hours each month, which arrangement permitted her to work full-time at various other nursing jobs while fulfilling her contract with We Care. According to Ms. Mouton, she began reducing her visits to the group homes to approximately once every other month when she accepted a full-time position as a case manager. She ended her relationship with We Care in November of 2002 as evidenced by a letter of resignation in which she gave the company two-weeks notice, as opposed to thirty days as required by their contract.

In describing the altercation giving rise to this suit, Ms. Mouton testified that one of the residents "came at me . . . swinging his fists." As she held onto him with

both of her arms to prevent him from striking her, she was pushed backward against a wall and injured her shoulder. Ms. Mouton indicated that she had received many calls about this resident, who was mildly retarded and hyperactive, and that the staff had previously reported several incidents of his aggressive behavior, including striking staff members and throwing objects at them.

Alva Jones, the director of We Care, testified that the company was required to have an RN available to its residents, as well as a physician, a therapist, and a psychologist, before it could be licensed to operate community homes in Louisiana. Ms. Jones explained that Ms. Mouton was expected to be at each home once a month to complete paperwork and to be available for calls at all times. Ms. Mouton's duties, as described by Ms. Jones, included maintaining each resident's medical records in compliance with state and federal regulations and responding to minor emergencies while on call. Ms. Jones testified that she had the authority to fire Ms. Mouton and that she had previously "let one RN go." She also testified that Ms. Mouton did not give We Care thirty-days notice as required by her contract before she left, leaving the company without an RN for a while.

Tranissa Morrison, a group home manager who witnessed Ms. Mouton's altercation with the resident at issue, testified that she saw the resident grab a telephone from Ms. Mouton and push her. Ms. Morrison also testified that the police had been called to the home on prior occasions about this resident's violent behavior and that a state supervisor had made a comment about his continued presence in the home. Ms. Morrison personally considered this resident to be a threat to the staff based upon their complaints about his behavior, and at least one staff member had said she would quit her job if he remained in the home. As a home manager,

3

Ms. Morrison understood that Ms. Mouton's duties included reviewing the residents' charts, preparing monthly reviews, updating medications, and attending to the residents' illnesses. She testified that she was aware of complaints about Ms. Mouton hardly coming to the home and not doing her paperwork properly.

After a hearing, the trial court stated that it granted We Care's motion as to "statutory employee" status, with the requirement that We Care provide RN services to its residents weighing heavily in its analysis.[1] On appeal, Ms. Mouton argues that the trial court erred in: (1) finding her to be a "statutory employee" of We Care and (2) granting the motion when genuine issues of material of fact exist as to her employee status. Because these assignments are interrelated, we will discuss them together.

## Opinion

Appellate courts review summary judgments *de novo* under the same criteria that govern the trial court's consideration of whether a summary judgment is appropriate. *Schroeder v. Bd. of Supervisors of La. State Univ.*, 591 So.2d 342 (La.1991). A motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966(B). Summary judgment procedure is favored and shall be construed "to secure the just, speedy, and inexpensive determination of every action." La.Code Civ.P. art. 966(A)(2).

---

[1]In its appellate brief, We Care points out that it has never contended that Ms. Mouton was a "statutory employee" under the provisions of La.R.S. 23:1061; rather, its motion is based upon the statutory presumption of employment found at La.R.S. 23:1044. We agree and find that a discussion of La.R.S. 23:1061 is not warranted here.

Concerning the burden of proof on summary judgment, La.Code Civ.P. art. 966(C)(2) provides:

> The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

We Care, as the movant on summary judgment, has the burden at this time of proving that there exists no genuine issue of material fact as to the two grounds for its motion: that Ms. Mouton is its employee, as opposed to an independent contractor, or that We Care is not legally responsible for Ms. Mouton's injuries. In discharging the first of these burdens, We Care relies on the presumption of employee status found at La.R.S. 23:1044, which provides in part: "A person *rendering service for another in any trades, businesses or occupations covered by this Chapter* is presumed to be an employee under this Chapter." (Emphasis added.) Although this presumption is usually relied upon by an alleged employee seeking workers' compensation benefits, it is likewise available to a party in We Care's position, who seeks to interpose the immunity of La.R.S. 23:1032 to a tort claim. *See Elmore v. Kelly*, 39,800 (La.App. 2 Cir. 7/29/05), __ So.2d __. To rebut this presumption, Ms. Mouton must either prove (1) that the services she provided were not "pursuant to any trade, business, or occupation (e.g., construction of one's private residence)" or (2) that she was performing services, "but was doing so as an independent contractor." *Hillman v. Comm-Care, Inc.*, 01-1140, p. 6 (La. 1/15/02), 805 So.2d 1157, 1161 (quoting 1 Dennis Paul Juge, *Louisiana Workers' Compensation* § 7:6

5

(2001)). If she is unable to rebut the presumption of employment, her exclusive remedy is in workers' compensation.

To determine whether the presumption is rebutted because the services were not "pursuant to any trade, business, or occupation," the initial inquiry is whether the work performed is a "business pursuit" of the alleged employer. *Id.* In finding that Ms. Mouton was an employee of We Care, the trial court relied primarily on the licensing requirement that We Care have RN services available to its clients. Although this factor weighs heavily in concluding that Ms. Mouton's services were performed in We Care's "trade, business, or occupation," we find that it is not determinative as to the second method of rebutting the presumption of employment, i.e., that the services, though part of We Care's "business pursuit," were nonetheless preformed by an independent contractor.

Louisiana Revised Statutes 23:1021(7) defines "[i]ndependent contractor," in part, as

> any person who renders service, other than manual labor, for a specified recompense for a specified result either as a unit or as a whole, *under the control of his principal as to results of his work only*, and not as to the means by which such result is accomplished . . . .

(Emphasis added.)

The supreme court further elaborated on independent contractor status in *Hickman v. Southern Pacific Transport Co.*, 262 La. 102, 117-18, 262 So.2d 385, 390-91 (La.1972) (emphasis added) (citation omitted) as follows:

> It is well understood by the courts of this State that the term independent contractor connotes *a freedom of action and choice* with respect to the undertaking in question and *a legal responsibility* on the part of the contractor in case the agreement is not fulfilled in accordance with its covenants. *The relationship presupposes a contract between the parties, the independent nature of the contractor's business and the nonexclusive means the contractor may employ in accomplishing the*

6

*work*. Moreover, it should appear that the contract calls for specific piecework as a unit to be done according to the independent contractor's own methods, without being subject to the control and direction, in the performance of the service, of his employer, except as to the result of the services to be rendered. It must also appear that a specific price for the overall undertaking is agreed upon; that its duration is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach.

The law further recognizes that inquiry to determine whether a relationship is that of independent contractor or that of a mere servant requires, among other factors the application of the principal test: *the control over the work reserved by the employer*. In applying this test it is not the supervision and control which is actually exercised which is significant, the most important question is whether, from the nature of the relationship, the right to do so exists.

. . . .

This right to terminate the relationship without cause, where no term of employment is prescribed, is characteristic of the master and servant or employer-employee relationship. The right is at the same time antagonistic to the independent contractor relationship.[2]

In contrast to an independent contractor relationship, "[t]he essence of the [employer-employee] relationship is the right to control." *Hillman*, 805 So.2d at 1162 (quoting *Alexander v. J. E. Hixson & Sons Funeral Home*, 44 So.2d 487, 488 (La.App. 1 Cir. 1950)). The four primary factors evidencing the right to control are: (1) selection and engagement, (2) payment of wages, (3) power of dismissal, and (4) power of control. *Id.* "None of these factors alone is determinative of an employer/employee relationship. Rather, the totality of the circumstances must be

---

[2]The analysis in *Hickman*, 262 So.2d 385, arose in the context of whether a truck driver at fault in an accident was the employee of a transportation company, so as to render the company liable to the plaintiff under the doctrine of *respondeat superior*. Finding that the truck driver was an employee, as opposed to an independent contractor, the supreme court looked at the contract between the parties, which provided for termination on written notice, without liability for breach thereof, and at the limited freedom of action the truck driver had in performing his work, including that the transportation company dictated both the time he reported to the depot each day and the order of his deliveries. The supreme court also considered that the driver had no other transportation jobs, even though he owned and maintained his own truck.

considered." *Harrington v. Hebert*, 00-1548, p. 7 (La.App. 3 Cir. 5/23/01), 789 So.2d 649, 653 (citation omitted).

Further, "[t]he distinction between employee and independent contractor status is a factual determination that must be decided on a case-by-case basis, taking into consideration the total economic relationship between the parties and the various factors weighing either in favor of or against an employer-employee relationship." *Elmore*, ___ So.2d at ___.

Because a determination of "employee" or "independent contractor" status is decided on the totality of the circumstances, the presence of the same factors in different cases can nonetheless result in differing outcomes, depending on the weight those factors are given in each case. For example, in *Hillman,* 805 So.2d 1157, the supreme court had to determine whether or not a beautician providing on-site services to nursing home residents was an employee of the nursing home and, therefore, entitled to workers' compensation benefits. Even though the beautician was required to interview for the position and the nursing home established the days that she worked and the prices that she charged, the supreme court found the plaintiff to be an independent contractor. Specifically, the supreme court found lacking "the right to control the *method and means* by which the individual performed the work tasks." *Id.* at 1164 (emphasis added). Additionally, because the plaintiff also worked at a beauty shop on the days she was not at the nursing home, the supreme court reasoned that her "simultaneous employment elsewhere further supports the independent nature of her beautician services." *Id.* at 1165.

In *City of Shreveport v. Kingwood Forest Apartments*, 32,370 (La.App. 2 Cir. 10/29/99), 746 So.2d 234, a full-time city police officer who also provided weekend

8

security services at an apartment complex sustained work-place accidents at both jobs that combined to cause his death. The issue before the court was whether the decedent was also an employee of the apartment complex, so as to render both the city and the complex liable for survivors' benefits. At the complex, the decedent was required to work specific hours each weekend, although he had no supervision and he could assign a substitute to take his place. He primarily kept a log of guest names and license plates, but he would also respond to disturbances or crimes as dictated by his training as a police officer. He could quit or be relieved of his position upon thirty days notice. In concluding that the decedent was an employee, the court looked to (1) "the absence of a specific undertaking or piecework to be performed within a specific time," (2) the element of control as evidenced "by the specific hours he was expected to work and by the recordings he was required to log," and (3) the "at-will" nature of the relationship (notwithstanding the thirty-day notice requirement) such that "his failure to act would not constitute a breach of contract with corresponding liability" but rather "the remedy for [his] nonperformance would be dismissal." *Id.* at 238. The presence of full-time employment elsewhere was apparently not as significant in *City of Shreveport* as it was in *Hillman*.

In *Harrington*, 789 So.2d 649, with two judges dissenting, this court found that all four of the control factors weighed in favor of finding a duck hunting guide who sought workers' compensation benefits to be the employee of a hunting club owner. The court specifically noted the owner's complete control over the selection of guides at the club, his assignment of all guides to their "sports," his ability to set the price for their services, and the guides' "at-will" tenure with the club.

9

In the present case, Ms. Mouton contracted to perform services as a "consulting nurse" for a group home company that was required to offer its residents the services of several medical professionals, although those professionals were not involved in the day-today operation of the homes. Included in Ms. Mouton's duties, as listed in the contract, were the requirements that she prepare, review, and supervise the implementation of a health care plan for each resident and that she care for their minor illnesses. These services, per We Care's licensing requirements, could only be provided by an RN. As recognized in *Contract Management Services, Inc. of Texas v. State*, 98-2010, p. 9 (La.App. 1 Cir. 11/5/99), 745 So.2d 194, 199, *writ denied*, 99-3466 (La. 2/11/00), 754 So.2d 939, "[n]ursing is clearly a profession" in which its members obtain admission through education, not by accepting a contract position.

In addition to the professional nature of the services provided by Ms. Mouton, the record reflects that she had great latitude in performing them. Although she was required to be at the group homes to complete paperwork, the timing of these visits was at her sole discretion, to the point where she was able to reduce the number of visits to accommodate another full-time position. She also used her professional judgment in responding to patient calls, in that she could decide whether a trip to the home was warranted or if an ambulance or other medical care was needed. Although We Care argues that its control over the means of her work is evidenced by the monthly visits and documentation that she was required to make, there is no evidence that anyone at We Care supervised these activities. Two other factors of control, selection and payment, appear neutral in this case, as anyone providing services to We Care, whether as an employee or an independent contractor, had to meet the director's approval and would receive some form of compensation. While the final

factor, the power of dismissal, may weigh in favor of employee status, in a "totality of the circumstances" test, we do not find that this alone is sufficient to overcome the professional nature of the services Ms. Mouton provided and the freedom of means she was given in accomplishing them. Accordingly, we find that the summary judgment granted as to employee status must be reversed.

In its motion, We Care also argued that summary judgment was appropriate on the merits of the case, i.e., there was no genuine issue of material fact that We Care was not negligent in its handling of this resident's admission or, alternatively, that Ms. Mouton was solely at fault for not informing We Care of the resident's violent propensities. The trial court did not reach this issue, but indicated at the hearing that there appears to be genuine issues of material fact precluding summary judgment on this question. We agree with the trial court's assessment. We Care has not identified the criteria for admission or the process that it followed regarding this resident's admission, and the record contains many references to its staff members' knowledge of this resident's behavior. We Care has clearly failed to meet its burden as the mover on summary judgment as to this issue.

**Decree**

For the above reasons, the judgment of the trial court is reversed and the case is remanded for proceedings consistent with this opinion. Costs of this appeal are assessed to defendant-appellee, We Care Homes, Inc.

**REVERSED AND REMANDED.**

11