STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

24-573


RONALD DAVIS

VERSUS

TUBE-TECH SERVICES, INC. AND
AMERICAN LIBERTY INSURANCE COMPANY


**********


APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 4
PARISH OF ACADIA, NUMBER 23-06351
PAULA MURPHY, WORKERS' COMPENSATION JUDGE

**********

SHARON DARVILLE WILSON
JUDGE

**********

Court composed of Sharon Darville Wilson, Gary J. Ortego, and Clayton Davis, Judges.



**AFFIRMED.**



**Davis, J.,** dissents and assigns written reasons.

Donovan J. O'Pry, II
Bernard R. Minyard
Grant J. Bratcher
Miles C. Hesterly
O'PRY LAW FIRM
2014 West Pinhook Road, Suite 507
Lafayette, Louisiana 70508
(337) 415-0007
COUNSEL FOR CLAIMANT/APPELLANT:
    Ronald Davis

David B. Parnell, Jr.
BLUE WILLIAMS, LLC
1060 W. Causeway Approach
Mandeville, Louisiana  70471
(504) 831-4091
COUNSEL FOR DEFENDANTS/APPELLEES:
    Tube-Tech Services, Inc. and American Liberty Insurance Company

**WILSON, Judge.**

Claimant, Ronald Davis (Davis), appeals the ruling of the Workers' Compensation Judge (WCJ) dismissing his claim for benefits against Tube-Tech Services, Inc. (Tube-Tech). For the following reasons, we affirm.

## I.

## ISSUES

Davis alleges the following assignment of error: "The trial court erred in granting Tube-Tech's Exception of No Right of Action, as [] Davis was an employee when he was injured in the course and scope of his employment." The issue is whether Davis was an independent contractor or an employee. If we find that Davis was an independent contractor, we must then determine whether the manual labor exception applies such that he would be eligible for benefits under the Louisiana Workers' Compensation Act.

## II.

## STANDARD OF REVIEW

It is well-settled that "[t]he distinction between employee and independent contractor is a factual determination to be decided on a case-by-case basis." *Fontenot v. J.K. Richard Trucking*, 97-220, p. 7 (La.App. 3 Cir. 6/4/97), 696 So.2d 176, 180. Furthermore, "[w]hether an individual's job involves manual labor is to be considered from the particular facts and circumstances of each case[,]" and whether an individual spends "a substantial part of his work time in manual labor" is a finding of fact. *Coleman v. Landstar Ranger*, 03-1943, p. 2 (La.App. 1 Cir. 6/24/04), 886 So.2d 472, 473.

Factual determinations in workers' compensation cases and rulings on peremptory exceptions of no right of action where evidence is introduced at the hearing are all subject to the manifest error standard of review. "[T]he issue to be

resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Stobart v. State through Dep't of Transp. & Dev.*, 617 So.2d 880, 882 (La.1993). Furthermore, "[e]ven though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony." *Id.*

## III.

## FACTS AND PROCEDURAL HISTORY

Davis was hired by Tube-Tech as a truck driver in October of 2022. Tube-Tech is a company that inspects and cleans oilfield pipe for its customers. Tube-Tech hires drivers to pick up and deliver the pipe. Tube-Tech owns one truck, which is a cab and flatbed trailer, and uses a third-party company for additional trucks as needed.

Blake Granger (Granger), the manager of Tube-Tech, testified that after about two weeks of employment, Davis came to him to ask what Davis could "do to make a little extra money." Granger testified that he told Davis that "he could switch [from W-2] to 1099, and there was a lot of tax benefits with it, . . . . So that was something that we discussed with him, and he agreed upon that . . . . [s]o he could collect a little extra money[.]" After the switch from W-2 to form 1099, Davis was paid $1.25 per mile and $15.00 per hour for any time he had to wait for the truck to be unloaded by the customer. This amount was charged back to the customer by Tube-Tech.

On October 20, 2023, Davis was delivering a load in Texas and stopped to re-secure it. When he exited the truck, he allegedly fell and injured his neck and back. He filed a claim for workers' compensation benefits, and Tube-Tech and its insurer, American Liberty Insurance Company, filed an exception of no right of action,

2

alleging that Davis was not an employee of Tube-Tech and was performing services as an independent contractor. The WCJ found that Davis was an independent contractor and that the manual labor exception was not applicable. Accordingly, the WCJ granted the exception of no right of action and dismissed Davis' claims with prejudice. This appeal followed.

**IV.**

**<u>LAW AND DISCUSSION</u>**

*Independent Contractor Status*

"Inherently, workers' compensation is a remedy between an employer and an employee; it follows then that absent an employer-employee relationship generally there can be no compensation recovery." *Hillman v. Comm-Care, Inc.*, 01-1140, p. 6 (La. 1/15/02), 805 So.2d 1157, 1161. There is a statutory presumption of employment status,[1] which the employer can rebut by establishing that the person was performing services as an independent contractor. *Id*. (footnote added).

Louisiana Revised Statutes 23:1021(7) defines an "[i]ndependent contractor" as:

> any person who renders service, other than manual labor, for a specified recompense for a specified result either as a unit or as a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished, and are expressly excluded from the provisions of this Chapter unless a substantial part of the work time of an independent contractor is spent in manual labor by him in carrying out the terms of the contract, in which case the independent contractor is expressly covered by the provisions of this Chapter. The operation of a truck tractor or truck tractor trailer, including fueling, driving, connecting and disconnecting electrical lines and air hoses, hooking and unhooking trailers, and vehicle inspections are not manual labor within the meaning of this Chapter.

While "[t]he essence of the [employer-employee] relationship is the right to control[,]" there are "four primary evidentiary factors considered in deciding"

---

[1] "A person rendering service for another in any trades, businesses or occupations covered by this Chapter is presumed to be an employee under this Chapter." La.R.S 23:1044.

3

whether such a relationship exists. *Hillman*, 805 So.2d at 1162 (alteration in original), quoting *Alexander v. J.E. Hixson & Sons Funeral Home*, 44 So.2d 487, 488 (La.App. 1 Cir. 1950). The four factors are:

1. Selection and engagement;

2. Payment of wages;

3. Power of [d]ismissal;

4. Power of control.

*Id*. (alteration in original).

This court in *Fontenot*, 696 So.2d at 180, quoted *Stovall v. Shell Oil Co.*, 577 So.2d 732, 738–39 (La.App. 1 Cir.), *writ denied*, 582 So.2d 1309 (La.1991), to define the conditions that must be met in order to find that a principal and independent contractor relationship exists:

1. There is a valid contract between the parties;

2. The work being done is of an independent nature such that the contractor may employ non-exclusive means in accomplishing it;

3. The contract calls for specific piecework as a unit to be done according to the independent contractor's own methods without being subject to the control and direction of the principal, except as to the result of the services to be rendered;

4. There is a specific price for the overall undertaking; and

5. Specific time or duration is agreed upon and not subject to termination at the will of either side without liability for breach.

The WCJ carefully considered each *Hillman* factor as well as each condition listed in *Fontenot*, 696 So.2d 176. The WCJ gave a detailed analysis of each *Hillman* factor based on her evaluation of the testimony. She issued thorough reasons for judgment that outlined her application of the *Hillman* factors to this case as well as her resolution of the factual disputes in the testimonies of Granger and Davis and the credibility determinations that were required to make such resolutions. She found

4

that all of the *Hillman* factors weighed in favor of finding that Davis was an independent contractor, and we agree.

There is an obvious dispute over whether Davis' election to switch the method of his payment from form W-2 to form 1099 changed the nature of his employment. Tube-Tech contended that Davis chose to become an independent contractor who would get offered a run that he could either accept or decline, was in control of his route (with Tube-Tech's sole concern being that the delivery was made at the specified time), and was paid by the mile without any tax deductions. The WCJ found that Davis "voluntarily re-negotiated his selection and engagement to a status more akin to an independent contractor."

Granger described the arrangement as follows: Davis lived about an hour away from the shop so they would have to offer it to another driver or hire a third party if it was an "on the spot" run. If Tube-Tech had a run for Davis, they would call or text him, and if he was available, he would come to the shop. He would then wait for Tube-Tech's truck to be loaded. Granger testified that Davis was responsible for the load and was expected to make sure that it was loaded according to Department of Transportation standards. Davis was given a delivery time, and he was free to use his discretion as to what time he needed to leave and what route he would take so long as he made the delivery on time. Davis testified that the route he took was his choice and that Tube-Tech did not prohibit him from taking any particular road. Tube-Tech did not control Davis' time of departure, the route he took, or the clothes he wore. He did not have a set schedule. Because Tube-Tech owned the truck, Tube-Tech was responsible for insurance, gas, and repairs.

Davis could work in the yard at Tube-Tech for an hourly rate if he wanted to, but Granger said "unfortunately, he didn't choose to do that often." Davis did work in the yard during the first two weeks at Tube-Tech before he switched to form 1099.

5

After the switch, Davis was not required to be at Tube-Tech to wait for a run. He was paid by the mile plus $15.00 per hour for any wait time, and his work was subject to there being a load available. The WCJ noted Granger's testimony that the person who replaced Davis at Tube-Tech is a salaried employee who, unlike Davis, is required to be at Tube-Tech at 7:00 a.m.: "[he] is an employee that works full time when the truck is not running. And when the truck is running, he hops in the truck and is paid no extra. He is salaried."

Davis testified: "the word 'contract' is being thrown around. But I mean, the truth is I was an employee, you know." Davis testified that he was there ninety-five percent of the time when they needed him and that he was "pretty sure" he worked in the yard more than the one day in 2023 that was indicated in the pay documents. He testified that he did not have any records of that because he had an iPhone that deleted all of his messages after thirty days. He did admit that on the one occasion that he worked in the yard after switching to form 1099 status, he was issued a form W-2 for that work. While Davis would not classify the call for a delivery as an "offer," he testified that he "definitely accepted it" because it was his job. He acknowledged that he did turn down some runs because he had other things to do. The WCJ noted that "there was no evidence presented that he was obligated to accept any specific request as would be expected by a traditional employee."

Granger also testified that Tube-Tech could terminate the relationship with Davis at any time or for cause, but he clarified that termination would occur for a breach of contract. In response to the WCJ's questions, Granger confirmed that nothing changed in the way that Davis got the delivery or how the runs were made; however, the WCJ did not find that this alone was dispositive of the issue of whether Davis was an independent contractor or an employee based on the totality of the factors considered.

6

The WCJ gave no credence to Davis' testimony that he wanted to switch back to employee status but felt coerced to stay on form 1099 status. Davis' discovery responses stated that he did not contact Tube-Tech about switching back, but he testified at trial that he did.

*Chaisson v. La. Rock Monsters, LLC*, 13-1423, p. 4 (La.App. 4 Cir. 4/2/14), 140 So.3d 55, 58, is analogous to this case:

> In the instant case, it is undisputed that Mr. Chaisson was hired each day to perform a specific project for an agreed upon price. Louisiana Rock Monsters exercised no control over how or when Mr. Chaisson performed the work, nor did it direct or supervise Mr. Chaisson's work. Mr. Chaisson used Louisiana Rock Monsters' truck and supplies. Louisiana Rock Monsters ensured that all drivers complied with the Department of Labor's mandatory pre-trip inspections on its trucks. Louisiana Rock Monsters also maintained the trucks. Although no contract existed between Mr. Chaisson and Louisiana Rock Monsters, he was paid using a 1099 form and no employment or other taxes were withheld from his pay. Based on the totality of the circumstances, the OWC judge found that Mr. Chaisson was an independent contractor. We find no error in that finding.

The WCJ's evaluations of credibility were reasonable. We find no manifest error in her conclusion that Davis was an independent contractor at the time of the alleged accident.

*Manual Labor Exception*

Louisiana Revised Statutes 23:1021(7) provides that an independent contractor is expressly excluded from the provision of the Workers' Compensation Act "unless a substantial part of the work time . . . is spent in manual labor by him carrying out the terms of the contract, in which case the independent contractor is expressly covered by the provision of this Chapter." "In sum, 'manual labor' consists of work in which the physical predominates over the mental; and a 'substantial part' of work time is spent performing manual labor at a rate that is more than 'insubstantial or immaterial.'" *Knox v. Elite Prot. Sol.*, 21-419, p. 16 (La.App. 4 Cir. 10/13/21), 366 So.3d 341, 353. The courts have construed the term

7

"substantial part" liberally and noted that "it is not a mathematical formulation." *Riles v. Truitt Jones Const.*, 94-1224, p. 10 (La. 1/17/95), 648 So.2d 1296, 1300.

Davis contends that even if he is an independent contractor, he is still entitled to receive workers' compensation benefits under the manual labor exception since a substantial part of his work time was made up of manual labor. Tube-Tech contends that the time that Davis spent walking around the pipes, adjusting and securing straps, and inspecting his loads is statutorily excluded from the definition of manual labor. "The operation of a truck tractor or truck tractor trailer, including fueling, driving, connecting and disconnecting electrical lines and air hoses, hooking and unhooking trailers, and vehicle inspections are not manual labor within the meaning of this Chapter." La.R.S. 23:1021(7). But, this court has found that doing manual labor for one and a half hours in a normal work day was a "substantial part" of a truck driver's work where he was required to load and unload his trailer for multiple runs in a day, climb up and down the ladder on the side of his trailer multiple times a day, inspect and clean out hoses, and open and close valves to begin and end the loading of his trailer. *McGrew v. Quality Carriers, Inc.*, 11-440, p. 5 (La.App. 3 Cir. 10/5/11), 74 So.3d 1253, 1257.

Granger testified that loading the truck might take ten minutes or more, but fifty percent of the time or more, the truck was already loaded by the time Davis got to the yard. Granger testified that a Tube-Tech employee would load the pipe onto the truck using a forklift. Either Davis or a Tube-Tech employee would place a layer of three or more boards between each layer of pipe, if necessary. Granger explained that specifically, the boards would be used if the pipes were being inspected and cleaned for future use as opposed to being sold or scrapped. Granger estimated that boarding the pipes was necessary about sixty percent of the time. Davis vehemently disagreed with Granger's estimation that more than fifty percent of the time the truck

8

was already loaded when Davis arrived. Davis testified: "I'm not going to say it didn't happen, but more times than not, I was the one assisting with the loading. Sometimes it was already loaded, but most of the times I was the one." When he arrived at the delivery location, Davis had to unstrap the load, but the customer would unload the pipe. Davis was required to remove any boards between the layers of pipe, put the boards in the basket on the trailer, and roll the straps. Each board weighed about eight to twelve pounds. Davis testified that unloading larger pipe took maybe fifteen to twenty minutes while unloading smaller pipe might take forty-five minutes to an hour.

Tube-Tech contends that any time Davis spent loading or unloading, fastening straps, or placing or removing boards was insubstantial compared to the time spent driving to the delivery sites. Tube-Tech asserts that *McGrew*, 74 So.3d 1253, is distinguishable because McGrew, unlike Davis, was contracted to make three trips per day. Davis, on average, seldom made more than one delivery per day. Davis testified that the most loads he might have done in one day was three and that it was usually one or two loads. The Tube-Tech office is in Church Point, Louisiana, and Davis made deliveries to Houma, Louisiana; Cocodrie, Louisiana; Zapata, Texas; Midland, Texas; and Victoria, Texas.

The WCJ found that the time Davis spent strapping down pipe and placing or removing boards, while manual, was not a substantial part of his work time when compared to the time he spent driving. We find no manifest error in this conclusion.

## V.

## CONCLUSION

For the foregoing reasons, we affirm the dismissal of Ronald Davis' claims against Tube-Tech Services, Inc. Costs of this appeal are assessed to Ronald Davis.

**AFFIRMED.**

9



*24-573 Ronald Davis v. Tube-Tech Services, Inc. & American Liberty Insurance Company*

**Davis, J., dissents and assigns written reasons.**

I respectfully dissent. The majority employs the manifest error standard of review, citing *Fontenot v. J.K. Richard Trucking*, 97-220, p. 7 (La.App. 3 Cir. 6/4/97), 696 So.2d 176. *Fontenot* took language from *Stovall v. Shell Oil Co.*, 577 So.2d 732 (La.App. 1 Cir. 1991), *writ denied,* 582 So.2d 1309 (La.1991), which said determining employment status is a "factual determination." Not only did these cases involve trials on the merits, rather than exceptions of no right of action, but the ultimate source of these dicta statements in *Fontenot* and *Stovall* came from cases that emphasized that each case must be determined on its own facts; nowhere did the source jurisprudence indicate the court's employment status conclusion is purely a factual determination always necessitating the manifest error standard. *See Sones v. Mutual of Omaha Insurance Company*, 272 So.2d 739 (La.App. 2 Cir.1972), *writ denied*, 273 So.2d 292 (La.1973) and *Pitcher v. Hydro–*

*Kem Services, Inc.*, 551 So.2d 736 (La.App. 1 Cir.), writ denied, 553 So.2d 466 (La.1989).

The determination of employment status is like any other legal issue that creates or destroys a right of action. It is made by deciding whether the legal presumption of employment is overcome using a strict statutory definition and established jurisprudential factors.

Generally, an exception of no right of action is reviewed de novo because the determination of whether a plaintiff has a right to bring the action is a question of law. *Guidry v. Ave Maria Rosary & Cenacle, Inc.*, 21-507 (La.App. 3 Cir. 6/1/22), 341 So.3d 779. If the parties introduce evidence at the trial on the exception of no right of action, appellate courts consider the lower court's findings of fact using the manifest error-clearly wrong standard of review. *CV Land, LLC v. Millers Lake, LLC*, 23-69 (La.App. 3 Cir. 11/2/23), 373 So.3d 529. However, where the material facts are not in dispute, the trial court essentially then must only determine legal issues, and thus, a reviewing court must apply the de novo standard of review. *Kevin Associates, L.L.C. v. Crawford*, 03–0211 (La.1/30/04) 865 So.2d 34.

The Louisiana Supreme Court has stated, "[T]he legal findings of the trial court are subject to review without the great deference standard we attach to

credibility determinations." *State v. Payne,* 01–3196, p. 6 (La.12/4/02), 833 So.2d 927, 933. Moreover, "It is self-evident…that if the trial court's decision was based on its erroneous interpretation or application of law rather than a valid exercise of discretion, such an incorrect decision is not entitled to deference." *Kem Search, Inc. v. Sheffield,* 434 So.2d 1067, 1071 (La.1983). Therefore, the manifest error standard applies only to issues of fact, and for issues of law, the appropriate standard is whether "the lower court's interpretive decision was legally correct." *Duhon v. Briley,* 12-1137, p. 4 (La.App. 4 Cir. 5/23/13), 117 So.3d 253, 257-58.

Evidence was introduced at the hearing in this matter. However, on the question of whether the claimant fit the definition of independent contractor, the workers' compensation judge did not need to make credibility determinations nor resolve contested facts. The essential facts were consistent between both parties' witnesses. Consequently, the issue is whether the lower court correctly applied the law to the established facts. Therefore, this Court must determine whether the lower court's ruling was "legally correct."

*Davis's Work Relationship Did Not Fit within the Independent Contractor Definition*

By definition, a worker cannot be "independent" from the entity paying him if his sole source of income comes from that entity, as Davis's did. Also, the statutory definition of an independent contractor in part defines such relationship as

3

one that is aimed to accomplish "a specified result either as a unit or as a whole." La.R.S. 23:1021(7). In contrast, Davis was hired to make an unspecified number of deliveries to an unknown number of clients for an indefinite time and perform general labor hourly.

Likewise, if a per mile payment plus hourly wage qualifies as an agreed upon specific price for the overall undertaking, nearly every agreement for compensation in a typical employment agreement would as well. La.R.S. 23:1021(13)(d) specifically addresses employees who perform piecework, so the mere fact that an employee is not paid hourly or by salary does not destroy his status as an employee.

Additionally, the duration of Davis's work was for an indefinite time and he was not free to carry out his work by his own methods. As stated in *Hickman*, "It would be specious to believe that he could radically vary his methods or pattern of pickup and delivery without provoking a reprimand or disciplinary action…" *Id.* at 392. Tube-Tech required its drivers to be on their insurance; therefore, Davis could not hire an assistant driver as a substitute, as an independent contractor would have the right to do.

Consequently, as the nature of Davis's work for Tube-Tech fits neither the statutory nor jurisprudential definition of an independent contractor, and because the default is a statutory presumption of employment, Davis is an employee of

4

Tube-Tech. However, because the lower court focused on the four factors highlighted by the Supreme Court surrounding the right to control giving rise to an employment relationship, I will address those as well below.

*The Lower Court Misapplied the Hillman Factors*

The lower court's written reasons found that Davis "voluntarily re-negotiated his selection and engagement to a status more akin to an independent contractor" in switching to 1099 reporting. The court believed the selection and engagement factor supported finding an independent contractor relationship. The fact that taxes are not withheld from a worker's pay does not create an independent contractor relationship. *Harrington v. Hebert*, 00-1548 (La.App. 3 Cir. 5/23/01), 789 So.2d 649; *Lewis v. Teacher's Pet, Inc.*, 621 So.2d 867 (La.App. 3 Cir. 1993), *writ denied*, 629 So.2d 1140 (La.1993). Rather, it is substance of the relationship not the label which determines whether a worker is an employee or an independent contractor. *Teel v. Superior Scrap Metals*, 95-969 (La.App. 5 Cir. 5/15/96), 675 So.2d 1169, *writ denied*, 96-1566 (La. 5/1/97), 693 So.2d 749.

Davis's job duties, tasks he performed, his interaction with the clients, and the way he was contacted to make deliveries after he switched to a 1099 reporting stayed the same. Accordingly, the lower court was legally incorrect in giving this change legal significance.

5

The lower court also found it a "notable distinction" that the driver who replaced Davis was a full-time salaried employee who had to report at a specific time and work when there were no deliveries to be made. Therefore, the court found the way in which Davis was paid (by mile plus an hourly rate for wait time and yard work) favored finding an independent contractor status.

The recognition that the later employee was paid differently is not in dispute. However, the earlier employee was paid per mile for deliveries, and Granger testified they changed the position after Davis left, including changing it to a salary position. The changing nature of the position gives little credence to the assertion that being paid per mile supports finding an independent contractor relationship when the employee preceding Davis was paid per mile for deliveries. Also, the lower court did not attach the proper legal significance to the fact that Mr. Davis was paid a bonus and given advances, as is done for an employee, and was also paid hourly for any wait time or work he performed in the yard.

The lower court further found that the power of dismissal weighed in favor of finding an independent contractor relationship. This conclusion was legally incorrect. Not only did Granger testify Tube-Tech had the right to terminate Davis at will, but there was nothing negotiated between the parties other than pay by mile for deliveries and by hour in the yard, and that Davis had to submit to background checks and drug tests. Typically, an independent contractor would perform work

6

for a certain term and negotiate protections from termination during that term as implied by the statutory and jurisprudential definitions. No protections or provisions governing termination were ever negotiated; therefore, the record supports that Davis could have been terminated at will.

The lower court found it significant that Davis did not have a set schedule, was not bound to accept any specific request (despite trying to accept them all), had the discretion to ensure the delivery was loaded to his standards,[1] and could travel on any road employing his own driving rules. Based on this, the lower court found Tube-Tech did not have the power to control Davis.

Davis did not call and negotiate potential future deliveries. He was entirely dependent on Tube-Tech. The relationship was one-sided as Davis's schedule was dictated by Tube-Tech telling him of a pre-scheduled delivery. There is nothing in the record to indicate that Davis could negotiate a certain number of guaranteed deliveries or change the delivery times that were set by Tube-Tech and Tube-Tech's clients. The very few times Davis "turned down" loads were analogous to an employee calling in sick or taking vacation.

---

[1]The fact that Davis had the discretion to ensure the delivery was loaded to his standards is of little weight, as Davis was operating a commercial vehicle between states, making him subject to the Federal Motor Carrier Safety Regulations. These regulations require all commercially licensed drivers to inspect and secure their loads.

Tube-Tech had the expectation that Davis would consistently make himself available for runs indefinitely and always called him first when they needed to make a delivery. Davis had an expectation of an ongoing employment relationship, as this was his only source of income. Regardless of what labels the parties gave this arrangement, Davis was an employee of Tube-Tech.

For the above reasons, I respectfully dissent.