Chief Judge JOAN BERNARD ARMSTRONG.
 

 11 The plaintiff-appellant, Printess Tate, Jr., (“Tate”) appeals a judgment in favor of the defendants-appellees, Durr Heavy Construction, LLC (“Durr”) and its insurer, the Gray Insurance Company (“Gray”), dismissing the plaintiffs suit against the defendants-appellees.
 

 Tate suffered personal injuries on March 19, 2002, when he was rear-ended by a truck driven by Gilbert Brown. The parties stipulated: (1) that the sole and proximate cause of the accident was Mr. Brown’s negligence, and (2) that the plaintiff was entitled to $175,000.00, plus interests and costs, should he prevail in the matter now before this Court. The sole issue on this appeal is whether Mr. Brown was an employee of Durr at the time of the accident, thereby enabling the plaintiff, Tate, to pursue Durr under a theory of
 
 respondeat sivpenor.
 
 At the time of the accident, Mr. Brown was hauling a load of sand for Durr to Durr’s job site at the Naval Air Station in Belle Chasse. The other issues are not contested. Such claims as the plaintiff may have had against other defendants were disposed of prior to this matter coming before the trial court, leaving only plaintiffs claims against Durr and Gray.
 

 |2Purr and Gray contend that Mr. Brown was an independent contractor and not Durr’s employee. In dismissing the plaintiffs claims against Durr and Gray, the trial court agreed. The distinction between employee and independent contractor status is a factual determination to be decided on a case-by-case basis.
 
 Arroyo v. East Jefferson General Hosp.,
 
 06-799, p. 6 (La.App. 5 Cir. 3/13/07), 956 So.2d 661, 664, citing
 
 Tower Credit, Inc. v. Carpenter,
 
 01-2875 (La.9/4/02), 825 So.2d 1125. As a factual determination it is subject to the manifest error/clearly wrong standard of review.
 

 The plaintiff describes the following factors in support of his contention that the trial court erred in finding that Mr. Brown acted as an independent contractor when doing work for Durr:
 

 As stated above, at the time of the accident, Mr. Brown was hauling a load of sand for Durr to Durr’s job site at the Naval Air Station in Belle Chasse. James Turner, the operations manager for Durr, knew Mr. Brown for fifteen or twenty years, during which time Mr. Brown
 
 *917
 
 hauled sand and rock for Durr. There was never a written contract between Mr. Brown and Durr. Mr. Brown could not recall having worked for anyone other than Durr for at least seven years prior to the accident. At the time of the accident, Durr had company owned trucks performing the same kind of work as that performed by Mr. Brown, hauling to the same locations pursuant to the same instructions and under the same conditions.
 

 Durr had the power to control where and from whom to pick up loads of sand, the times to be at a particular site to begin loading, and the location where loads of sand were to be deposited. Mr. Brown even referred to the Durr operations manager as his “boss.”
 

 lijMr. Brown had worked on Durr’s job site for a week hauling sand to the airbase in Belle Chasse. A flagman would normally direct Mr. Brown where to go and where to dump the load. Mr. Brown hauled sand for Durr on the day before the accident and awoke the morning of the accident, and left for the Durr job site without receiving specific instructions. On a typical day on the naval base project, Mr. Brown would check in with a Durr employee to find out what materials to haul and where. Durr did not simply hire Mr. Brown to deliver a certain quantity and quality of sand to a destination; instead Durr told Mr. Brown where and from whom to pick up the materials, and where to deliver loads on a daily basis.
 

 Durr countered with the following list of factors that it contends support the trial court’s finding that Mr. Brown was acting as an independent contractor when he hauled materials for Durr:
 

 (1) Mr. Brown was free to work for any company or individual who could use his service.
 

 (2) Mr. Brown was paid by the load for deliveries made for Durr, i.e., he was paid neither by the hour nor by salary, and Durr sent him a 1099 form at the end of the year.
 

 (3)Dun1 did not withhold taxes from payments made to Mr. Brown; nor did Durr provide Mr. Brown with benefits such as health insurance or paid vacation time. Durr’s employees did receive such benefits.
 

 14(4) Mr. Brown was free to work or not work with Durr on any particular day without having to call and report to any Durr employee or supervisor.
 

 (5) Mr. Brown was responsible for the insurance on his trucks and for any and all maintenance and repairs.
 

 (6) Durr did not control the manner in which Mr. Brown performed the work entrusted to him. He arrived at a site and received basic instructions for the day. Mr. Brown then performed the work in the manner he saw fit, including choosing the route between sites.
 

 (7) Mr. Brown was not required to undergo a drug screen or physical, unlike Durr’s employees.
 

 (8) Durr was not required to drive any particular truck.
 

 In ruling in favor of Durr and Gray, the trial court made the following relevant written findings:
 

 This Court finds that Gilbert Brown was working as an independent contractor at the time he was involved in the accident with the plaintiff. At the time of the accident, Brown operated a truck service named “Gilbert Brown Truck Service.” His truck service consisted of hauling loads of material to or form construction sites. Brown was free to work for any company or individual who could use his service, though at the time of the accident he was primarily doing work for Durr. Though he performed a
 
 *918
 
 good deal of work for Durr, this Court finds that Brown was not an employee of Durr. Brown was paid by the load for deliveries made for Durr, and Durr sent him a 1099 tax form at the end of the year reflecting the amounts paid to him. Durr did not withhold federal or social security taxes, nor did Durr | ¡provide Brown any typical employment benefits such as health insurance or paid vacation time. Brown was free to work or not work with Durr on any particular day without having to call and report to any Durr employee or supervisor. Brown was responsible for the insurance on his trucks and for any and all maintenance and repairs. This court notes that Durr did not control the manner in which Brown performed the work entrusted to him. Brown arrived at a site and a Durr employee gave him basic instructions for the day. Brown then performed the work in the manner he saw fit, including choosing the route between the sites. On the day of the accident, Brown was operating a truck he owned to deliver a load for Durr. The evidence at trial clearly demonstrates the existence of an independent contractor relationship between Brown and Durr.
 

 All of the facts found in the passage from the trial court’s written reasons for judgment quoted above are supported by the record. While the trial judge referred to a number of factors material to her finding that Mr. Brown was an employee of Durr, the two highlighted passages above quoted from the findings of the trial court seem to this Court to be the most persuasive.
 

 The only two witnesses to testify live in the trial court were Mr. James Turner and Mr. Brown. Neither party challenges the credibility of either witness in their briefs to this Court.
 

 Turner testified that Mr. Brown would make several hauling trips a day. When Mr. Brown would arrive at a site, before he would dump he would sign the load in with a clerk at the site. The clerk might be a representative of Durr or on occasion it could be the representative of a general contractor retained by Durr. A Durr representative would tell Mr. Brown where to dump the load. At the time of the accident, Mr. Brown would have been hauling sand. Mr. Brown would sign for it when he picked it up, but Durr would pay the supplier. Someone from Durr would tell Mr. Brown where to pick up the sand. Turner further testified that:
 

 Ifilf Brown is contracting, hauling from us at any particular day, he should follow the directions of the person who’s in charge of the site.
 

 Mr. Turner went on to testify that Mr. Brown was paid by the load and was paid once a week on Friday. Mr. Brown could accumulate tickets and be paid on a future Friday if he chose to do so. Mr. Turner had the authority to stop Mr. Brown from hauling at any time. On those occasions when Mr. Brown had a breakdown, Mr. Turner might authorize Durr to give Mr. Brown an advance. Durr trucks were stored on Durr property overnight, but contract haulers were not permitted to do so without special permission. Mr. Turner testified that he did not have the authority to tell Mr. Brown to get his truck repaired or fixed. Mr. Turner testified that there were no consequences if Mr. Brown did not show up for work:
 

 If Brown doesn’t — look, guys show up in the morning to haul and by noon they’re gone. They show up in the morning to haul and sometimes they don’t take the first load out. Because, they’re independent, if someone else offers 50 cents a yard more, they go. I have no control over stopping them. Either I match the price or get into a price war with them, or they’re gone.
 

 
 *919
 
 Similarly, if Durr failed to provide work for Mr. Brown, Mr. Brown had no right to any form of penalties or damages or compensation. Mr. Turner testified that no independent driver, such as Mr. Brown, had ever made a claim against Durr for workers’ compensation benefits.
 

 Mr. Brown testified that Durr paid him either by the load or by the hour. At the Naval Air Station job site where Mr. Brown was working for Durr at the time of the accident, either a Durr representative or “somebody from the military” would tell him where to drop off the load of sand. Flagmen would direct traffic to keep accidents from happening at the job site, but Mr. Brown did not know if the [^flagmen were Durr employees. Mr. Brown testified that he would keep hauling until someone from Durr told him to stop. He testified that during the seven-year period prior to the accident while he may have worked primarily for Durr, he did not do so exclusively. He also testified that, “you could easily be fired if you broke one of their safety rules.” He said that Durr could have told him which route to take, but that he did not have to comply with the request. While he did not refer to Turner as his supervisor, he did refer to him as his boss. Mr. Brown testified that he also did work for Boh Brothers, T.R. James, Hamp’s Construction, A to Z Unlimited out of Baton Rouge, Johnny Smith in Slidell, about two or three other contractors in Slidell and Delta Paving. Mr. Brown testified that he contracted with whoever was paying the most at the time and that it was not always Durr. He testified that he did not need Durr’s permission to do anything and that he could take months off at a time should he choose to do so.
 

 On redirect examination he testified that he had done no work for Boh Brothers for four or five years before the accident and that he did only small amounts of work for the other contractors he had mentioned. When asked to explain his testimony on the subject given in a previous deposition, Mr. Brown explained that he basically worked primarily for Durr for the seven years prior to the accident.
 

 Hillman v. Comm-Care, Inc.,
 
 01-1140, (La.1/15/02), 805 So.2d 1157, discussed a fact situation as complex as the one now before this Court:
 

 In
 
 Boswell
 
 [v.
 
 Kurthwood Manor Nursing Home,
 
 94-703 (La.App. 3d Cir.12/7/94), 647 So.2d 630], Justice (then Judge) Knoll found the nursing home’s provision of these beautician services to be an accommodation to its elder residents. In so doing, Justice Knoll cited as analogous a line of jurisprudence rejecting similar attempts to characterize patient sitters as hospital ^employees. 94-703 at p. 2, 647 So.2d at 631 (citing
 
 Prince v. Baton Rouge General Hospital,
 
 449 So.2d 90 (La.App. 1st Cir.),
 
 writ denied,
 
 450 So.2d 966 (La. 1984), and
 
 Vaughn v. Baton Rouge General Hospital,
 
 421 So.2d 288 (La.App. 1st Cir.1982)). In those cases, the courts reasoned that while the hospital made the initial contact to obtain the sitter, this was done solely as an “accommodation” for its patients.
 
 Vaughn,
 
 421 So.2d at 290.
 

 Attempting to distinguish the beautician services Comm-Care offered from a mere accommodation, Hillman emphasizes that Comm-Care advertised it offered such in-house beautician services and that its residents became upset during the interval when such services were temporarily discontinued. This argument overlooks that Comm-Care was not in the “trade, business, or occupation” of providing beautician services.
 

 Id.,
 
 pp. 7-8, 805 So.2d at 1162.
 

 The
 
 Hillman
 
 court went on to explain that:
 

 
 *920
 
 The essence of the [employer-employee] relationship is the right to control. The four primary evidentiary factors considered in deciding the above are—
 

 1. Selection and engagement;
 

 2. Payment of wages;
 

 3. Power of [dismissal;
 

 4. Power of control.
 

 [Alexander v. J.E. Hixon & Sons Funeral Home],
 
 44 So.2d [487] at 488 [ (La.App. 1 Cir.1950) ]. The appellate courts in subsequent cases, including the sitter cases noted above, have utilized this test. In so doing, the courts have reasoned that none of the factors is controlling, that the totality of the circumstances must be considered, and that the burden of proof is on the party seeking to establish an employer-employee relationship.
 

 In factual scenarios strikingly similar to that presented in this case, the Third Circuit in
 
 Boswell
 
 and
 
 Jordan
 
 [v.
 
 Central Management Co.,
 
 99-748 (La.App. 3d Cir.10/13/99), 745 So.2d 116] applied this four-factor test to characterize the beautician as an independent contractor, not an employee. In reaching a contrary conclusion in the instant case, the Third Circuit enumerated four facts that it found distinguished this case from
 
 Boswell;
 
 to wit: (i) Hillman was required to interview for the position; (ii) [ oComm-Care controlled both her work days and hours; (iii) Comm-Care controlled its beauty salon facility; and (iv) Comm-Care, although it did not directly pay her, controlled the amount she could charge the patients to whom she provided the services. [FN3 omitted.]
 

 Id.,
 
 01-1140, pp. 8-9, 805 So.2d at 1162.
 

 In
 
 Hillman,
 
 the Louisiana Supreme Court found that Hillman was an independent contractor in spite of all the factors described above that would favor a finding of an employer-employee relationship. This is consistent with the statement near the beginning of this opinion that there is no hard and fast rule, and that the distinction between employee and independent contractor status is a factual determination to be decided on a case-by-case basis.
 

 Citing
 
 Hickman v. Southern Pacific Transport Company,
 
 262 La. 102, 116-117, 262 So.2d 385, 390 (1972), the plaintiff argues that a written contract is a
 
 sine qua non
 
 of an independent contractor relationship and that there is no written contract in the instant case. We do not find any requirement in
 
 Hickman
 
 that the contract be in writing. Moreover, in the
 
 Hillman
 
 case,
 
 supra,
 
 which is thirty years more recent than
 
 Hickman
 
 and also cited by the plaintiff, the Louisiana Supreme Court did not require a written contract.
 

 However, there are a number of factors found in
 
 Hickman
 
 that are common to the case now before us:
 

 Applying these principles to the facts before us, it is readily apparent that Fowler is not an independent contractor. His freedom of action in performing the work required of him was limited in several respects. The time for the performance of the pickup and delivery chores was dictated and controlled by the depot agent, and, often, the order in which the deliveries of the pickup and delivery chores was dictated prescribed by him.
 

 Fowler’s business was not independent. His sole source of employment, other than grave-digging after [ ^working hours, was with Southern Pacific Transport. Nor can it be said that Fowler was free to carry out this work by his own methods. It would be spe-
 
 *921
 
 eious to believe that he could radically vary his methods or pattern of pickup and delivery without provoking a reprimand or disciplinary action by Southern Pacific Transport.
 

 Another, and perhaps the most telling, fault in the contention that these facts present an independent contractor relationship is the stipulation that the contract between the parties could be terminated by either party upon written notice to the other, without incurring liability for breach; and the further stipulation that Southern Pacific Transport had the right to terminate the relationship at any time when Fowler’s services ‘shall be unsatisfactory’ to Southern Pacific Transport.
 

 Id.,
 
 262 La. at 118-119, 262 So.2d at 391.
 

 Hickman
 
 also sets forth some of the criteria the court felt were material to the finding of the existence of an independent contractor relationship:
 

 The relationship presupposes a contract between the parties, the independent nature of the contractor’s business and the nonexclusive means the contractor may employ in accomplishing the work. Moreover, it should appear that the contract calls for specific piecework as a unit to be done according to the independent contractor’s own methods, without being subject to the control and direction, in the performance of the service, of his employer, except as to the result of the services to be rendered. It must also appear that a specific price for the overall undertaking is agreed upon; that its duration is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach.
 
 Amyx v. Henry & Hall,
 
 227 La. 364, 79 So.2d 483 (1955).
 

 Id.,
 
 262 La. at 117, 262 So.2d at 390-391.
 

 The strongest points in favor of plaintiffs appeal are that Mr. Brown performed the same kind of work as that performed by Durr’s own in-house fleet of trucks, that Durr set a price, and that Durr paid Mr. Brown on Friday much as one would pay weekly wages to an employee. Mr. Brown was not paid a specific Inprice for the overall job — but that is easily explained as he was just one independent trucker among many on the job — he was not performing an overall job. However, there were many indicia of the employer-employee relationship as regards the in-house truckers, such as control over hours, days of work, employment benefits, etc., that do not apply to Durr. Moreover, in
 
 Hillman
 
 independent contractor status was not forfeited by agreeing to a preset non-negotiated schedule of compensation.
 

 Also citing
 
 Hickman, supra,
 
 the defendants argue strongly that, “the most important characteristic of a principal-independent contractor relationship is an agreement on a specific duration of time for the performance of contemplated work during which neither party can terminate the relationship without incurring liability for the breach.” However, the Supreme Court did not even consider that as a factor in the much more recent
 
 Hillman
 
 case,
 
 supra,
 
 where one may infer that both Comm-Care on the one hand and Hillman on the other were free to terminate the relationship at any time without notice or penalty.
 

 This Court feels that the crux of this case is to determine what is the nature of an independent hauler. We do not believe that Mr. Brown’s independence is destroyed by the fact that Durr tells him where to deliver the loads he hauls. While Durr could and did give Mr. Brown some directions when he was on the job, to suggest that Mr. Brown should have been given the discretion of delivering the loads
 
 *922
 
 to wherever he chose is not reasonable. We find that Mr. Brown has as many if not more indicia of independence as the plaintiff in
 
 Hillman
 
 and the Supreme Court found Hillman to be independent in spite of a number of factors that could have supported a finding of an employer-employee relationship. Paramount among the factors supporting a finding that Mr. Brown was an independent | ^contractor and not an employee, is the uncontested finding that he could turn up or not on any given day as he saw fit, a flexibility this Court has never seen afforded to an employee and we may safely assume is a freedom not afforded to Durr’s in-house employee drivers. This factor is followed closely by the fact that Mr. Brown owned, maintained and insured his own truck and received no employee benefits, all of which distinguish him from Durr’s in-house employee drivers. Therefore, we are unable to conclude that the trial court was manifestly erroneous/clearly wrong in finding that Mr. Brown was an independent contractor.
 

 For the foregoing reasons, we affirm the judgment of the trial court.
 

 AFFIRMED.
 

 JONES, J., concurs in the result.