1 t This is a trucking accident case, involving numerous claims of personal injury and 'wrongful death, in which Plaintiffs/Appellants, Lewis Knoten, individually arid on behalf of Laila Knoten and Danielle Adams, Candace Walker, individually and on behalf of Kyren Thomas and Di’Avion Hite, and Alvin Welch (collectively the “Appellants”), appeal the December 11, 2013 judgment of the district court.[1]

Facts and Background

Shortly after midnight on December 25, 2008, an eighteen-wheeler, operated by Tammy Westbrook (‘Westbrook”) on Interstate 10 near Laplace, Louisiana, collided with the rear of a GMC Yukon (the “Yukon”), driven by Lewis Knoten (“Krio-ten”), pushing the Yukon into the rear of a Lincoln LS (the “Lincoln”), driven by Alvin Welch (“Welch”).[2] On impact, the Yukon caught fire. Danielle |2Adams (“Adams”), Adams’ and Knoten’s daughter Laila Knoten (“Laila”), Candace Walker (Walker”), and Walker’s two children, Kyren Thomas (“Kyren”) and Di’Avion Hite (“Di’Avion”), were passengers in the Yukon. There were no passengers' in the Lincoln driven by Welch. Adams, Kyren, and Di’Avion were killed in the accident, while Walker, Laila, Knoten, and Welch sustained injuries.
When the collision occurred, the Yukon and the Lincoln were traveling in a caravan at a speed 5 to 6 miles per hour in the right hand lane of the -interstate highway, as the Lincoln had a .flat- tire on the front driver’s side.
At the time of the accident, Westbrook had been driving for '33 of the past 36 hours. Westbrook had departed City of Industry, California two days earlier, on December 23, 2008, in an attempt to arrive at her parents’ home in Destrehan, Louisiana by Christmas morning, prior to making deliveries scheduled several days later in Opelousas, Louisiana, and Midway, Tennessee. ¡
Westbrook was employed by Western Star Transportation, L.L.C. (“Western Star”) as a driver. When the accident occurred, the eighteen-wheeler driven by Westbrook contained a load of plants owned by Nurserymen’s Exchange, Inc. (“Nurserymen’s”).-: The plants were being sold and transported to Wal-Mart locations in Louisiana and Tennessee pursuant to a supplier agreement between Nurserymen’s and Wal-Mart. In order for the plants to arrive at Wal-Mart, Nurserymen’s contracted with Shippers Choice, Inc. (“Shippers Choice”), 'a freight forwarder, to arrange for transportation of the plants. Shippers Choice in turn Centered into a contract with Western Star, a motor carrier, to provide for the ultimate transportation and delivery of the plants.
. Prior- to Nurserymen’s releasing the plants to Westbrook for delivery, Nurserymen’s corporate .representative met with Westbrook and required her to agree to and sign a delivery instruction sheet.
*384 The Appellants contend that Lee Bertram Cadwallader and Christie Jo Cadwal-lader are owners of Western Star and owners of the eighteen-wheeler tractor driven by Westbrook.
Prior to trial, the Appellants filed a motion for partial summary judgment contending that Shippers Choice was vicariously liable for Westbrook’s negligence under a theory of respondeat superior, also known as vicarious liability. Partial summary judgment was granted in favor of the Appellants. Shippers Choice filed an application for supervisory review with this Court, which was denied. No further appeal of this ruling was filed.[3]
Trial by jury went forward from October 28 to November 14, 2013, where the jury awarded total damages as follows:
$37,804,427.02 Candace Walker
$44,405,104.62 Laila Knoten
$ 5,199,682.64 Lewis Knoten
$ 1,644,231.00 Estate of Danielle Adams
$ 164,362.73 Alvin Welch
$767,000.00 LCarlos Hite, Jr. (father of Di’Avion Hite)
$767,000.00 Bertell Thomas (father of Kyren Thomas)
The jury assigned a percentage of fault for the accident to the parties as follows:
Tammy Westbrook 40%
Western Star Transportation, L.L.C. 45%
Lee Bertram Cadwallader 10%
Christie Jo Cadwallader 5%
Lewis Knoten 0%
Alvin Welch 0%
TOTAL . 100%
The jury did not find that Westbrook was in the course and scope of a master-servant relationship with Nurserymen’s at the time of the accident, and the district court rendered judgment in favor of Florists Mutual Insurance Company, as insurer of Nurserymen’s.[4]
The Appellants filed a motion for partial judgment notwithstanding the verdict, which was denied by the district court. This appeal followed.
The Appellants contend that the jury erred by failing to find that Westbrook was in the course and scope of a master-servant relationship with Nurserymen’s at the time of the accident; that the jury instructions regarding the master-servant | .^relationship were erroneous; and that a demand for defense and indemnity allegedly made by Westbrook to Nurserymen’s should have been admitted as evidence before the jury.

Evidentiary Rulings

We first address the evidentiary rulings raised on appeal. A trial court is afforded vast discretion with regard to evi- *385 dentiary rulings, and the court’s decision to admit or deny evidence will not be disturbed on appeal absent a clear abuse of that discretion. Guillot v. Daimlerchrysler Corp., 2008-1485, p. 21 (La.App. 4 Cir. 9/24/10), 50 So.3d 173,190.
The Appellants argue that the district court abused its discretion by excluding evidence that Westbrook allegedly demanded defense and indemnity from Nurserymen’s in an email. The email read, in pertinent part:
I’m writing this letter to find out if there’s any way I can have insurance through Nurserymen’s. I knew that I was working for Western Star at the time of the accident. However, I’ve learned over the course of all of the depositions, I may be an agent for Nurserymen’s at least for this load.
[[Image here]]
I have heard the court found there was enough of a connection between me and Nurserymen’s that the judge said this case should go to the jury. If that is the case, then I think that Nurserymen’s insurance should help protect and defend me as well.. I was carrying their load of freight.
The email was sent to Nurserymen’s attorneys from Westbrook’s sister’s email address, but, on questioning outside of the jury’s presence, Westbrook denied any involvement in drafting or sending the email or any knowledge of the email prior to learning of it during trial. The district court found that the email could not be authenticated by Westbrook as a witness.
| ¿‘Authentication is the process whereby something is shown to be what it purports to be.” Malloy v. Vanwinkle, 94-2060, p. 4 (La.App. 4 Cir. 9/28/95), 662 So.2d 96, 100, citing La. C.E. art. 901. “The requirement of authentication or identification- as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims,” La. C.E. art. 901(A).
“Because authentication of evidence is a condition precedent to admissibility, an exhibit that is not authenticated does not constitute competent evidence.” Price v. Roy O. Martin Lumber Co., 2004-0227, p. 8 (La.App; 1 Cir. 4/27/05), 915 So.2d 816, 822. Louisiana Code of Evidence article 901(B) includes a non-exclusive list of methods that may be utilized to authenticate evidence, including testimony of a witness with knowledge and any method of authentication or identification provided by Act of Congress' or by Act of the Louisiana Legislature.- This Court has found documents properly excluded from evidence where the witness-who was asked to identify the documents could not attest to their authenticity. See Young v. Logue, 94-0585, p. 43 (La.App. 4 Cir. 5/16/95), 660 So.2d 32, 60.
The Appellants contend that-the email should be admissible as impeachment evidence under La. C.E. Art. 607[5] to attack Westbrook’s credibility, specifically West-brook’s testimony that she was confused about who Nurserymen’s was and |7that she was not an agent of Nurserymen’s. According to the Appellants, “the only time that Westbrook seemed certain in her testimony was when she was questioned by Nurserymen’s insurance counsel” and that “no one prepared her to answer Nursery *386 men’s questions, testimony that strains credulity.” The Appellants contend that this sudden certainty by Westbrook in denying Nurserymen’s control over her work stood in stark contrast to her prior testimony, which the Appellants characterized as equivocal. -The Appellants contend that the jury should have had the opportunity to view the email and assess Westbrook’s credibility.
Nurserymen’s contends that the district court correctly found that the email could not be authenticated, as Westbrook testified that she.did not write it and could only speculate on how the email came to be drafted. Nurserymen’s argues that np evidence was introduced to show that West-brook wrote the disputed email. We agree that the email was not authenticated through any testimony or other evidence, and accordingly the district court did not abuse its discretion in excluding it.

Jury Instt'uctions,

We next address the assignments of error concerning the jury instructions at trial. In Wooley v. Lueksinger, 2009-0571 (La.4/1/11), 61 So.3d 507, the- Supreme Court discussed extensively the law relative to jury charges.
La. C.C.P. art. 1792(B) requires a district judge to instruct the jury on the law applicable to the cause submitted to them. “The trial court is responsible for reducing the possibility of. confusing the jury and may exercise the right to decide what law is applicable and what law the trial court deems inappropriate!” Adams v. Rhodia, Inc., 2007-2110-p. 5-6 (La.5/21/08), ■ 983 So.2d 798, 804.- Com sidering the | «complexity and number of issues for the jury to decide in this case, the district judge determined from the outset she wanted to simplify the instructions and interrogatories for the jury’s consideration. The question here is whether the district judge adequately instructed the jury, as that concept has been defined by this court:
[ajdequate jury - instructions are those which fairly- and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues., The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately. set forth the issues to be decided by the jury and may constitute reversible error.
Adams, 2007-2110 p. 6, 983 So.2d at 804.
Generally, “the giving of an allegedly erroneous jury instruction will not constitute grounds for reversal unless the instruction is erroneous and the complaining party has been injured or prejudiced thereby.” Rosell, 549 So.2d at 849. In fact, Louisiana jurisprudence is -well established that a reviewing court must exercise great restraint before it reverses a jury verdict due to an erroneous jury instruction. Adams, 2007-2110 p. 6, 983 So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023. We have previously explained the following basis for this rule of law:
[tjrial courts are given broad discretion in formulating jury instructions and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial *387 system. We assume a jury will not disregard its sworn duty and be improperly motivated. We assume a jury will render a decision based on the evidence and ■ the totality of the instructions provided by the judge.
Adams, 2007-2110 p. 6, 983 So.2d at 804; see also Nicholas, 1999-2522 p. 8, 765 So.2d at 1023. When a reviewing court finds the jury was erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. 'Adams, 2007-2110 p. 6, 982[983] So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023.
iJn order to determine whether an erroneous jury instruction was given, reviewing courts must assess the targeted portion of the instruction in the context of the entire jury charge “to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its determination.” Adams, 2007-2110 p. 7, 983 So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023; Rosell, 549 So.2d at 849, The ultimate inquiry on appeal is whether the jury instructions misled the jury to such an extent that the jurors were prevented from dispensing justice. Adams, 2007-2110 p. 7, 983 So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023.
The law is clear the review function is not complete once error is found. Prejudice to the complaining party cannot automatically be assumed from the mere fact of an error. Instead, the reviewing court must then compare the degree of the error with the adequacy of the jury instructions as a whole and the circumstances of the case. As we found in Adams:
the manifest error standard for appellate review^ may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a.verdict based on the. law and facts. Thus, on appellate review of a jury trial the mere discovery of an error in the judge’s instructions .does not of itself justify the appellate court conducting the equivalent of a trial de novo, without first measuring the gravity or degree 'of error and considering the instructions as a whole and the circumstances of the case.
Id., 2007-2110 p. 7-8, 983 So.2d at 805.
Wooley, 2009-0571 at pp. 81-83, 61 So.3d at 573-75.
The Appellants argue that the jury instructions regarding the master-servant relationship and vicarious liability were so duplicative and confusing that they interdicted the jury’s fact finding process and led to an erroneous jury verdict. The Appellants argue, in part, that additional jury charges' should have been included regarding Nurserymen’s “right to control” Westbrook’s work. According to the Appellants’ argument, a jury given proper instructions should have reached the l ioconclusion that Nurserymen’s was master to Westbrook and vicariously liable for her tortious actions resulting in the accident.
The jury instructions given at trial were as follows:
Normally, one person is not responsible for the conduct of another person who may have caused damage to someone. But in certain situations, the law imposes responsibility upon a person or entity for the conduct of another, if they are in a relationship which can serve as an appropriate basis for imposing such responsibility. The law calls this “vicar *388 ious liability,” which simply means that a person may be liable for the acts of another even though that first person is not himself at fault.
If you find that Nurserymen’s Exchange contracted with the tortfeasor to do something for it but did not control how she- did it or when she did it, then you must conclude that the individual is an independent contractor responsible for her own conduct and Nurserymen’s Exchange is not responsible for her conduct.
A master is liable for the negligence of its servant which is committed in the course and scope of his or her master servant/employment relationship. Such negligence is in the course of the master servant/employment relationship if it is so closely connected in time, place, and causation to her duties as to be regarded as a risk of harm fairly attributable to the master’s business as compared with conduct motivated by purely personal considerations entirely extraneous to the master’s business.
If you determine that the servant who was negligent was on a purely personal mission at the time of the accident which was unrelated to her master/servant employment relationship, then she was not in the course and scope of that employment relationship, and the master is not liable for her conduct.
A master is liable for the damages caused by the fault of his servant if the incident occurs while the servant is exercising the functions for which he was hired. Sometimes this principle is shortened to the statement that a servant must have been in the course and scope of his or her master/servant employment relationship.
In order to recover against the master, the plaintiffs must prove by a preponderance of the evidence that the tort-feasor was a servant of the master, the servant was at fault, and the tort occurred during the exercise of the functions for which the servant was hired.
| nln some cases, such as this one, there may be a dispute as to whether the tortfeasor was, in fact, the servant of the master, or at least should be treated as if she were.
A servant is a person who is engaged by another to render services or labor. The single most important factor in determining whether an individual is someone else’s servant is the right that person has to control the work of that individual, in particular, the physical details of the way the work is carried out.
Here, to reach a verdict, the jury was required to decide whether Westbrook qualified as the servant/employee of Nurserymen’s. To make this decision, the jury also had to decide whether Westbrook was the servant of one or more masters. However, the jury instructions do not provide any explanation of law to assist the jury in deciding whether Westbrook qualified as the servant/employee of only Western Star, only Nurserymen’s, or both. We find that the district court erred by failing to instruct the jury on the legal standard for dual employment, also known as borrowed employment or the “two masters” rule.
The Louisiana Supreme Court has found that an “individual may simultaneously be the employee of more than one employer for the purposes of vicarious liability under La. Civ.Code art. 2320.”[6] Doe v. Parau *389 ka 97-2434, p. 5, n. 4 (La.7/8/98), 714 So.2d 701, 704. The Court “specifically repudiated the ‘one master’ rule in favor of solidary liability among the general and the special employers.” Morgan v. ABC Mfr., 97-0956, p. 13 (La.5/1/98), 710 So.2d 1077, 1084. See also Blair v. Tynes, 621 So.2d 591, 599 (La.1993); LeJeune v. Allstate Ins. Co., 365 So.2d 471, 482 (La.1978). For this reason, our Supreme Court has liafurther held that a jury instruction following the “one master” rule is “inconsistent with the current law of the borrowed servant doctrine in Louisiana” and that giving such an instruction is legal error. Morgan, 97-0956 at p. 13, 710 So.2d at 1084.
While we find that the jury instructions do sufficiently explain the master-servant relationship for a single master/employer, these instructions fail to charge the jury with the legal standard to determine whether Westbrook may have been the servant of two masters. We find not only the jury instructions but also the jury interrogatories confusing on this issue. In both Interrogatory Numbers 1 and 16, Westbrook is specifically identified as the “employee” of Western Star. Thus, the jury was asked to decide whether West-brook was acting in the course and scope of a master-servant relationship with Nurserymen’s, while the jury was also told in the jury interrogatories that Westbrook was the servant of Western Star.
Accordingly, we find that the district court committed legal error in failing to instruct the jury on the legal standard for dual employment. When such a prejudicial error of law skews the trial court’s finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Morgan, 97-0956 at p. 13, 710 So.2d at 1084, citing Lasha v. Olin Corp.,- 625 So.2d 1002, 1006 (La.1993). Therefore, in this opinion, we consider the trial record de novo to determine whether Westbrook was in the course and scope of a master-servant relationship with Nurserymen’s at the Intime of the accident, and whether Nurserymen’s is vicariously liable for any negligence by Westbrook.[7]

Master-Servant Relationship

According to Nurserymen’s argument, Westbrook was merely an independent contractor, over whom Nurserymen’s had no right to exercise control, which precludes a finding of vicarious liability against Nurserymen’s.
“Generally, employers are vicariously liable for the torts of their employees.” Gumpert v. Pittman Const. Co., 98-2269, p. 6 (La.App. 4 Cir. 6/9/99), 736 So.2d 1026, 1031. “The premise of vicarious liability is codified in La. Civ.Code art. 2320, which provides an employer is liable for *390 the tortious acts of its ‘servants and overseers- in the exercise of the functions in which they are employed,”’ Richard, v. Hall, 2003-1488, p. 5 (La.4/23/04), 874 So.2d 181, 137.
“The distinction between employee and independent contractor status is a factual determination to be decided on a case-by-case basis.” Tate v. Progressive Sec. Ins. Co., 2008-0950, p. 2 (La.App. 4 Cir. 1/28/09), 4 So.3d 915,. 916. .
The- essence of the employer-employee relationship is the right to control. Id. at p. 8, 4 So.3d at 920. The primary factors evidencing the right to control are: (1) selection and engagement, (2) payment of wages, (3) power of dismissal, and (4) power of control. Id, citing Hillman v. Comm-Care, Inc., 2001-1140, p. 8 (⅛1/15/02), 805 So.2d 1157, 1162. “[T]he courts have reasoned that none of the factors is controlling, that the totality of the.circumstances must-be considered, and that the burden of proof is on the party seeking to establish an employer-employee relationship.” Hillman, 2001-1140 at p. 9, 805 So.2d at 1163.
There is no fixed test, nor is the existence of a contract or any other single factor determinative, but the following factors should be considered in determining the existence of a borrowed servant relationship: “(1) first .and foremost, right -of control; (2) selection of employees; (3) payment of wages; (4) power of dismissal; (5) relinquishment of control by the general employer; (6) which employer’s work was being performed at the time in question; (7) agreement, either implicit or explicit between the borrowing and lending employer; (8) furnishing-of necessary instruments and the place for performance of the work in question; (9) length of time in employment; (10) acquiescence by the employee in the new work situation.” Walters v. Metro. Erection Co., 94-0162, pp. 4-5 (La.App. 4 Cir. 10/27/94), 644 So.2d 1143,1146. .
In Morgan, the Louisiana • Supreme Court stated: - - .-
Our jurisprudence has held that special and general employers may-, be solidarity liable in tort to third parties injured by the negligence of their employees. In LeJeune v. Allstate Ins. Co., 365 So.2d 471 (La.1978), we. addressed the issue of whether the general employer of a negligent employee remained liable for its employee’s tort despite the fact that the employee had been borrowed to perform services for a special employer at the time of ah accident. We held that a general and special employer may be solidarity liable for injuries to a third party, caused by an .employee’s negligence.
[[Image here]]
-. [B]oth employers had contemporaneous control over [the worker at issue], and both contemporaneously benefited from hisJjjjlabor. It is therefore reasonable that considering the overlapping control and shared financial interest that they share liability.
Morgan, 97-0956 at p. 10, 710 So.2d at 1082-83, citing Blair, 621 So.2d at 599.
The following facts were undisputed. Nurserymen’s entered -into a supplier agreement to provide plants to Wal-Mart and have them shipped to certain Wal-Mart locations. Nurserymen’s charged freight charges to Wal-Mart for arranging delivery of plants. In order to have the plants transported to Wal-Mart, Nurserymen’s contracted with a freight forwarder, Shippers Choice, who in turn contracted with Western Star, a commercial trucking company, to furnish a driver to deliver the plants to Wal-Mart. There was no dispute that Westbrook was the general employee of Western Star.
*391 For the load carried by Westbrook at the time of the accident, plants were purchased by Nurserymen’s from A.B. Bonsai and picked up by Westbrook at A.B. Bonsai’s facility in City of Industry, California on December 23, 2008. At A.B. Bonsai, Westbrook met with Jerry Bungo, a representative of Nurserymen’s, who presented Westbrook with a driver instruction sheet requiring Westbrook to agree to the following:
(1) To ensure that a temperature recorder was placed in the truck and started, and temperature maintained within a specified range;
(2) To verify case count per the bill of lading prior to loading;
(3) To obtain customer signature on bill of lading, keep the pink original, and give the customer the goldenrod copy;
||6(4) To return the temperature recorder tape to Nurserymen’s along with the pink original bill of lading, where failure return the tape may result in:
a. Nurserymen’s holding the driver/carrier liable for temperature related problems,
b. Nurserymen’s ability to fine the driver $150.00;
(5) To call Shippers Choice to check in each day.
Bungo, on behalf of Nurserymen’s, required Westbrook to agree to and sign the driver instruction sheet. According to Carolyn Jacobs, a representative of Nurserymen’s shipping ■ department, if West-brook had not signed the driver instruction sheet, Nurserymen’s would not have released the load to Westbrook. According to Westbrook, had she refused to sign the instruction sheet and not received the load, she would not have been paid. Westbrook signed the driver instruction sheet.
At trial, Westbrook attested that her responsibilities were to deliver the freight to the appropriate destination, to deliver on time, and to keep the freight in good shape. i She testified that when the accident happened, she-was following all instructions on the driver instruction sheet, and she checked on the condition of the plants after the accident.[8]
| ^Nurserymen’s argues that it exercised no control over the tractor trailer, West-brook’s driving methods or rest schedules, so that it could not control her negligent acts in this case. We do not find this dispositive of the master-servant relationship. The Supreme Court has held that an employer is liable for any tort of its employees regardless of the employer’s ability to prevent the act. The Court explained in Morgan: ' ■
Although Article 2320 provides that employers are only liable when they might have prevented the act which caused the damage, the courts of this state have consistently held that employers are vicariously liable for any torts occasioned by their employees. Ermert v. Hartford Ins. Co., 559 So.2d 467 (La.1990).[foot-note 6] This judicial interpretation of La: Civ.Code art. 2320 has been codified by the legislature in La. R.S. 9:3921, which provides, in part: “every, master or employer is answerable for the damage occasioned by his servant or employee in the. exercise of the functions in which they are employed.” *392 [footnote 6] See, Stone, Louisiana Civil Law Treatise, Tort Doctrine § 89 at p. 125:
But whatever the reason or reasons which prompted the original article, courts step by step have refused to apply the exculpatory clause, at first as to corporations and later more generally, with the result that Louisiana, like France and the common law, holds the employer liable for damage done by his employee in the course and scope of his employment. Various reasons have been advanced to explain the change: the notion that the employer benefits from the employee’s activity on his behalf so he should be responsible for harm done to others by such activity; the availability to the employer' of insurance covering such risks, the cost of whose premiums could be readily borne by the employer; the argument that where two innocent parties are involved (the victim and the employer), it is better that the employer bear the loss, the act of the servant being in contemplation of law, the master’s act; the notion that the employee is merely carrying out the commands of the employer (as distinguished from the independent contractor). Westbrook or a finding of a master-servant relationship between Nurserymen’s and West-brook.
11 ¡Morgan, 97-0956 at p. 5, 710 So.2d at 1080.
The Appellants contend that by demonstrating, in writing, an unusually high degree of control over the freight and the driver, Nurserymen’s destroyed the independent contractor status that may have otherwise existed between Nurserymen’s and Westbrook. We agree.
Under the particular facts of this case, the driver instruction sheet is fatal to Nurserymen’s claim of independent contractor status. Rather than rely on the contract with its freight forwarder, Shippers Choice, Nurserymen’s exercised control over Westbrook by having a Nurserymen’s representative meet with Westbrook before she departed with the load and requiring her to agree to a list of instructions.[9] Specifically, from an economic standpoint, Nurserymen’s required West-brook to agree to be fined for not complying with the instructions, and Nurserymen’s would . not release the freight to Westbrook had she not signed the driver instruction sheet, the result of which would be that Westbrook would not be paid for transporting the freight.
Accordingly, pursuant to our de novo review, we find by a.preponderance of the evidence that Westbrook was acting in the course and scope of a master-servant relationship with Nurserymen’s Exchange at the time of the accident, .and as such,
11flNurserymen’s is vicariously liable for Westbrook’s negligence.[10] We therefore *393 find that the jury erred in finding no master-servant relationship between West-brook and Nurserymen’s.

Conclusion

In conclusion, for the reasons set forth in this opinion, we reverse the December 11, 2013 judgment of the district court in favor of Florists Mutual Insurance Company, as insurer of Nurserymen’s Exchange, Inc., and we find Nurserymen’s Exchange, Inc. vicariously liable for the negligence of Tammy Westbrook. We remand this matter to the district court for entry of judgment consistent with this opinion and for such further proceedings as .may be necessary.
REVERSED AND REMANDED

. Defendants, Western Star Transportation, L.L.C., Tammy Westbrook, Lee Cadwallader, and Christie Jo Cadwallader and their insurer National Specially Insurance Company, separately appealed the December 11, 2013 judgment of the district court, but subsequently dismissed their appeals pursuant to -settlement.

. The record reflects that Alvin Welch’s legal name is Alvin McCall, but that he had been known as Alvin Welch-.for much of his life. We refer to him as Alvin Welch throughout this appeal.

. Following trial but prior to appeal, Shippers Choice was dismissed from this litigation pursuant to settlement.

. Florists Mutual Insurance Company filed an Appellee brief addressing the Appellants’ arguments. Its insured, Nurserymen's, did not file an appeal or an Appellee Brief. For the purposes of this opinion, however, when discussing arguments made on appeal by Florists Mutual, we also refer to the insurer as "Nurserymen’s.”

. "Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness’ testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issties, or unfair prejudice.” La. C.E. art. 607(D)(2). '

. La. Civ.Code art. 2320 provides, in pertinent part: "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed ... In the above cases, responsibility only attaches, *389 when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it ...”

. Ordinarily, determination of the vicarious liability issue is a mixed question of law and fact. Russell v. Noullet, 98-0816, p. 5 (La. 12/1/98), 721 So.2d 868, 871. However, “[wjhere one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence.” Ferrell v. Fireman’s Fund Ins. Co., 94-1252, p. 7 (La.2/20/95), 650 So.2d 742, 747, citing McLean v. Hunter, 495 So.2d 1298 (La.1986); Picou v. Ferrara, 483 So.2d 915, 918 (La.1986); Suhor v. Gusse, 388 So.2d 755, 758 (La.1980).

. Nurserymen’s did not govern the distance or length of time that Westbrook was allowed to drive or when and whether she was to fake breaks. Neither Nurserymen’s nor Western Star was aware that Westbrook had intended to travel toward Destrehan, Louisiana for the purpose of visiting her mother before the plants were delivéred. ' Nurserymen's had no prior contact with Westbrook before this load. She was not paid any wages "directly by Nurserymen's and Nurserymen’s did not assess any fines against her.

. The contract between Nurserymen’s and Shippers Choice contained an appendix of "temperature control requirements,” which was very similar to the driver instruction sheet signed by Westbrook. The contract required Shippers Choice to abide by the instructions in the appendix. Considering that Nurserymen’s required Westbrook to agree to and sign the driver instruction sheet, rather than relying on the contract with Shippers Choice, we do not find that the agreement by Shippers Choice to abide by these instructions precludes a finding that Nurserymen’s exercised an elevated level of control over

. We do not find that the partial summary judgment finding Shippers Choice vicariously liable for Westbrook’s negligence precludes a finding of a master-servant relationship with Nurserymen’s, as the Louisiana Supreme ' Court has found that an "individual may simultaneously be the employee of more than one employer for the purposes of vicarious liability under Lá. Civ.Code art. 2320.” See *393 Parauka, 97-2434 at p. 5, n. 4, 714 So.2d at 704.